FLEXMIR, INC., A NEW JERSEY CORPORATION, PLAIN-
TIFF-RESPONDENT, v. LINDEMAN & COMPANY, A NEW
JERSEY CORPORATION, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued June 18, 1951—Decided July 6, 1951.

Before Judges McGEEHAN, JAYNE and WM. J. BRENNAN, JR.

*Mr. Morris M. Schnitzer* argued the cause for appellant (*Mr. Louis K. Press,* attorney; *Mr. Daniel G. Kasen,* of counsel).

*Mr. Raymond W. Troy* argued the cause for respondent (*Messrs. Lum, Fairlie & Foster,* attorneys; *Mr. Vincent P. Biunno,* on the brief).

The opinion of the court was delivered by

JAYNE, J. A. D.   The respondent, Flexmir, Inc., utilized its premises designated as Nos. 20-28 Broome Street in the City of Newark in its business of metalizing plastics.   To supply heat for the building it operated in the boiler room an Enterprise oil burner of the industrial type consuming fuel oil of grades Nos. 5 and 6 with the aid of a preheating unit.   During a period of about two years preceding January 3, 1948, it purchased the requisite quantities of Nos. 5 or 6 oil from the appellant, Lindeman & Company.

The use of the heavy grade of oil is more economical in the operation of burners of the industrial type, but by reason of its quality of viscosity it is advantageous to increase its fluidity by means of a preheating device before its introduction through the appropriate nozzle into the combustion chamber of the furnace.

The appellant was aware of the pattern of the oil burner and its accessories maintained by the respondent and always furnished to the respondent a No. 5 or 6 grade of oil.

About six o'clock on the afternoon of January 2, 1948, the appellant delivered to the respondent and placed in the latter's underground storage tank 200 gallons of No. 2 fuel oil. The tank had a capacity of 3,000 gallons. It is estimated that there were at that time some 500 or 600 gallons of the No. 5 or 6 oil remaining in the tank. The suction pipe through which the oil is withdrawn from the tank for its introduction into the preheater and burner is located about four or five inches from the bottom of the tank.

Since the employees, except perhaps some members of the office force, were not expected to work at the plant on the following day, Saturday, January 3, 1948, the superintendent of maintenance discontinued the operation of the oil burner during the night. Having started it early the following morning, it operated about one-half hour when an explosion suddenly occurred in the boiler room. It is from this mishap that the present litigation eventuated.

The plaintiff-respondent has a judgment in conformity with the verdict of the jury against the defendant-appellant in the sum of $9,269.60 damages, which we review in pursuance of the present appeal.

The cause of action was prosecuted solely upon the allegation of a breach by Lindeman & Company of the statutory implied warranty of quality and fitness of the No. 2 grade of oil.

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"(5) An implied warranty or condition as to quality or fitness for a particular purpose may be annexed by the usage of trade." *R. S.* 46:30–21.

Our inquiry is confined by the appellant to the question whether "the verdict is against the greater weight of the evidence on the issues of the alleged breach of warranty and its causal relationship to the fire and explosion."

We may well impart that there was a former trial of this case in which the court granted the motion of the defendant to dismiss the action at the close of the plaintiff's case. *Rule* 3:41–2. The consequent judgment was reversed and a new trial directed. Consult 4 *N. J.* 509 (1950).

The cogent point debated on the present appeal is whether, phrased in the parlance of actions *ex contractu,* there was evidence adequately to support the logical and legitimate inference that the breach of the warranty was the cause which naturally and probably led to and which may have been reasonably expected to produce the injurious result. *Crater v. Binninger,* 33 *N. J. L.* 513 (*E. & A.* 1869); *Bonhard v. Gindin,* 104 *N. J. L.* 599 (*E. & A.* 1928); *Yormack v. Farmers' Cooperative Ass'n. of N. J.,* 11 *N. J. Super.* 416 (*App. Div.* 1951).

In our study of the evidence relating to this feature of the case, including the opinions of the expert witnesses, we encounter a quandary in undertaking to trace on the factual chart designed by the evidence a course of deductive reasoning which logically leads to the conclusion that in all probability the supply of the No. 2 oil in the circumstances of this case caused the explosion.

The plaintiff theorized that the No. 2 oil was drawn into the preheater, reached its flashpoint and vaporized in the preheater, and the vapors passed into the combustion chamber of the burner where upon ignition the explosion resulted.

The uncontroverted evidence disclosed that at the time of the delivery of the No. 2 oil, not less than 300 to 400 gallons of No. 5 or 6 oil were in the storage tank at or above the level of the withdrawal outlet which as previously explained was located four or five inches above the bottom of the tank. The maximum quantity of oil consumed by the burner on a cold day was 150 gallons. From that premise it is not reasonable to suppose that more than 25 gallons of oil had been withdrawn from the tank from the time of the receipt of the No. 2 oil until the occurrence of the explosion. Perhaps much less, if mathematically calculated.

It seems to have been quite universally acknowledged by the expert witnesses that by merely pouring 200 gallons of No. 2 fuel oil into a 3,000-gallon tank on top of 500 or 600 gallons of industrial oil, the light and heavy oils would stratify. The No. 2 would remain on the surface of the No. 5 and 6, the latter having the higher specific gravity, unless the contents of the tank were otherwise and much more vigorously agitated.

With that information, the inference was that the No. 2 oil was separated from the withdrawal outlet by the interposition of not less than 300 or 400 gallons of the heavy oil, from which not more than from 15 to 25 gallons were subducted during the 60 minutes of the operation of the burner on the evening of the delivery of the No. 2 oil and on the morning of the explosion.

Succinctly stated, the factual finding of the jury that the No. 2 oil, not substantially inspissated by its percolation through the heavy oil, reached the preheating unit in such a quality as to there produce explosive vapors which travelled into the combustion chamber of the burner in a sufficent volume to cause the explosion, seems to inhabit the abode of possibility, rather than that of probability. The possible causes of an explosion of this nature are commensurate with the fertility of one's imagination, such as faulty ignition, a leaking magnetic oil valve, a failure to clean the strainer, neglect to remove the sludge, and perhaps many others.

Assuredly the plaintiff was not required to negative the existence of all or any of the mere possibilities nor to prove with certainty that the defendant's breach of the implied warranty caused the damage, but the evidence must justify the logical inference that the alleged causal relationship is a probable or more probable hypothesis, with reference to the possibility of other hypotheses. *Jochim v. Montrose Chemical Co.,* 3 *N. J.* 5 (1949).

It is this significant differentiation between proof of a possibility rather than of a probability that has captured our particular attention in the consideration of the evidence

in the present case. It is an axiom of logic that the influential weight and value of an expert opinion depend upon the hypothetical foundation upon which the opinion is based.

Manifestly the opinions of the expert witnesses called on behalf of the plaintiff assume the postulate that the No. 2 grade of oil without material change in its substantive flashpoint quality entered the preheating unit. We think that in the existing state of the evidence there is no reasonably logical inference to support that premise.

Moreover there was considerable evidence that in similar circumstances the use of a quantity of No. 2 oil together with grades Nos. 5 and 6 had not in actual experience caused an explosion. We are not unaware that in some of such instances some adjustments had been made in the units associated with the burner.

In consequence of the inadequacy of the plaintiff's proofs to which we have specifically referred, we conclude that the verdict of the jury was not sufficiently supported by the evidence and that the judgment under review should be set aside. *Hager v. Weber,* 7 *N. J.* 201 (1951).