LAURITZ I. GUDNESTAD, PLAINTIFF-APPELLANT, v. SEABOARD COAL DOCK COMPANY, A FOREIGN CORPORATION, DEFENDANT, AND PENNSYLVANIA RAILROAD COMPANY, A FOREIGN CORPORATION, DEFENDANT-RESPONDENT.

LAURITZ I. GUDNESTAD, PLAINTIFF-APPELLANT, v. SEABOARD COAL DOCK COMPANY, A FOREIGN CORPORATION, DEFENDANT-RESPONDENT, AND PENNSYLVANIA RAILROAD COMPANY, A FOREIGN CORPORATION, DEFENDANT.

Argued March 8, 1954—Decided March 29, 1954.

212

*Mr. Arthur J. Sills* argued the cause for appellant (*Messrs. Wilentz, Goldman, Spitzer & Sills*, attorneys).

*Mr. George F. Lahey, Jr.*, argued the cause for respondent Pennsylvania Railroad Company.

*Mr. Harry E. Walburg* argued the cause for respondent Seaboard Coal Dock Company (*Messrs. Cox & Walburg*, attorneys).

The opinion of the court was delivered by
WACHENFELD, J.  The plaintiff brought suit against the Pennsylvania Railroad Company, John Gerba, Jr., and Seaboard Coal Dock Company, alleging he was severely injured by reason of their negligence on September 13, 1950 when he was struck by a coal dump railroad car in the railroad company yard in South Amboy under circumstances described later.

The jury returned a verdict of $60,000 in favor of the plaintiff against the Pennsylvania Railroad Company, hereinafter referred to as Pennsylvania, but exonerated Seaboard Coal Dock Company, hereinafter referred to as Seaboard, and John Gerba, Jr.

After the denial of motions for a new trial by the plaintiff, directed toward Seaboard and Gerba, by the Pennsylvania, cross-appeals were filed  The Appellate Division reversed as

to the railroad company and affirmed as to Seaboard and Gerba, thereby nullifying the plaintiff's recovery.

Petitions for certification in both the Pennsylvania and Seaboard cases were granted, bringing the issues here for disposition. The cause against the defendant Gerba was abandoned.

The coal dock, together with the land, railroad tracks, dumper, kick-back system, all appurtenances, equipment and machinery at South Amboy, was owned by the Pennsylvania. This property suffered considerable damage as a result of a terrific explosion on May 19, 1950.

Shortly thereafter the restoration of the plant was undertaken. Many men were engaged in this endeavor, and the electrical repairs throughout the entire extensive area, including work on the two dumpers, were performed by Coleman Electric Company under contract with the Pennsylvania. In addition to the eight or nine Coleman employees, of whom the plaintiff was one, there were carpenters, laborers and other craftsmen working "all over the place," "crossing the tracks," in an effort to put "those dumpers and that operation back in place."

The operation referred to, by which coal is transferred from railroad cars into barges, is described with exceptional clarity in the opinion of the Appellate Division, *Gudnestad v. Seaboard Coal Dock Co.*, 27 *N. J. Super.* 227 (*App. Div.* 1953), and reference is directed to the graphic explanation therein for an understanding of the system.

It reveals that Seaboard is an independent contractor hired by the Pennsylvania to conduct the unloading operation. It assumes charge of the loaded coal car at the foot of a trestle-like structure called a dumper and operates the necessary machinery to draw the car up an incline to a platform where the coal is emptied out. At this point a brakeman in the employ of the Pennsylvania takes his position in the rear of the car. After the next car shoves it off the platform, the unloaded car proceeds by gravity along a length of track on the ground to another incline of kick-back, ascends that structure, and then, when its momentum is expended, gravity

reverses its direction. As it descends the kick-back, a switch automatically operates to direct the empty car onto a track traversing the dumper and running out into another section of the yard.

While traveling along the portion of track between the kick-back and the yards, an empty coal car with the defendant Gerba attending the brake struck the plaintiff, severing his leg and inflicting other personal injuries.

The theory of liability sought to be enforced against the Pennsylvania is grounded in invitation, it being urged that the railroad was derelict in its duty of keeping its premises safe for the plaintiff, allegedly an invitee at the point where the mishap occurred.

As to Seaboard, it is generally alleged this independent contractor was remiss in its obligation to exercise due care with respect to the plaintiff, who was lawfully on the premises owned by the Pennsylvania.

### As to the Pennsylvania Railroad Company

The trial court determined that the plaintiff, "being an employee of a contractor doing work for the Pennsylvania Railroad Company, became an invitee on the premises in so far as the Pennsylvania Railroad is concerned," and therefore the railroad company "owed the plaintiff a duty of exercising reasonable care commensurate with this invitation." Whether or not the defendant fulfilled its obligation in this respect was left to the jury for its determination.

However, the Appellate Division concluded there was no competent proof warranting "an inference that the railroad company impliedly invited the employees of the contractors engaged in the making of the repairs to cross the tracks at that place and proceed beneath the trestle as a means of entrance and egress to or from their places of actual employment on the property." It therefore voided the judgment entered upon the jury's verdict.

The reasoning employed at the trial level was premised upon an implied invitation emanating from the contractual

relationship between Coleman and the Pennsylvania which created the duty in the defendant to render the premises reasonably safe for the purpose of the plaintiff's engagement. *Sommer v. Public Service Corp.*, 79 *N. J. L.* 349 (*Sup. Ct.* 1910).

But the Appellate Division decided this defendant was then absolved from that duty because the liability created by it was only co-extensive with the invitation extended, which was exceeded, relying upon *Phillips v. Library Co.*, 55 *N. J. L.* 307 (*E. & A.* 1893).

We have no quarrel with the rule of the *Phillips* case, *supra*, but are not in accord with the Appellate Division's application thereof to the case *sub judice*.

There is ample evidence here that Coleman's employees, including the plaintiff, up to the time No. 2 dumper was put into operation, worked throughout a wide area, including the machine shop and both dumpers. For a period of over two months they had traversed the tracks freely and frequently at the point in question as well as at others to accomplish their respectively assigned tasks in making the repairs called for by their employer's contract.

The testimony indicated there was a shed about ten feet to one side of the tracks along which the plaintiff was struck and about 50 feet diagonally away from the place where he was attempting to cross the tracks. It was in the vicinity of one of two dumpers owned by the Pennsylvania, designated numerically during the trial as dumper No. 1 and dumper No. 2. This building was used as an office by the foreman of Coleman's employees, who kept their tools there and changed to street clothes before going to their cars at quitting time. There is no evidence indicating when the shack was erected other than the testimony of the foreman that it was there when he arrived on the job.

The plaintiff, along with most of the other workmen, parked his car in a gulley about one-quarter of a mile from dumper No. 2. It was necessary to cross the tracks somewhere in order to travel between this parking area and the shed, unless one were to detour "a couple of hundred feet" by

going around the kick-back at the end of the track. The evidence indicates this circuitous route was not resorted to, but rather that both Coleman employees and others crossed "anywhere" before dumper No. 2 was "put into final operation."

Furthermore, the workmen were frequently obliged to cross the track in question in order to get from the shed containing their tools to the place of their daily work. "The dumper was down and we were back and forth all the time with flood lights, piping, wiring, ripping down pipes and taking down old wire." And the witness Callahan, testifying for the plaintiff with respect to one of the photographs in evidence, said: "The dumper being down, we crossed here sometimes and would go along here to the spigot and wash up or else we would come down around here. We crossed any place beyond here."

"Q. You were pointing to in front of the dumper, and as you are looking at the picture you are in back of the dumper. A. Yes.

Q. And that generally was what happened there as to crossing the tracks. I mean the men crossing over to get to the other side. A. Yes, that was about the normal procedure coming across the tracks."

In addition to this, there was ample testimony that the specific point at which the plaintiff crossed the tracks had been used as a means of access to a "passageway" under the trestle immediately opposite thereto. The evidence indicates the men crossed frequently at either end of the dumper, because at those places they could pass beneath the structure. The plaintiff spoke of going through one passageway in order to make his way to the shed, but said if he were working "on the forepart of the dumper, I would go through the other passageway." Had he not been struck, he testified he would have crossed the tracks "right across through the passageway. * * * I would have walked right through here, underneath the stairway, through the passageway." And at the place where the accident happened, Gudnestad insisted there was a definite path: "I know definitely there is a pathway in there."

The pattern of behavior and the prevalent, recognized practices indicative of the custom as to usage of the means of ingress and egress in question by a large number of employees upon the premises over a long period of time seem well established by the record.

In *Murphy v. Core Joint Concrete Pipe Co.*, 110 *N. J. L.* 83 (*E. & A.* 1932), the rule is succinctly stated to be:

"* * * the owner or occupier of lands who by invitation, express or implied, induces persons to come upon the premises, is under a duty to exercise ordinary care to render the premises reasonably safe for the purposes embraced in the invitation. *Phillips v. Library Co.*, 55 *N. J. L.* 307; *Nolan v. Bridgeton & Millville Traction Co.*, 74 *N. J. L.* 559; *Mayes v. Splitdorf Electrical Co.*, 94 *N. J. L.* 460; *Gibeson v. Skidmore*, 99 *N. J. L.* 131; *Roper v. Commercial Fibre Co.*, 105 *N. J. L.* 10."

"It is well settled that where the occupier of lands engages an independent contractor to do work upon his premises, an employee of the contractor, while executing the work, is there presumably by the request of the occupier, and is an invitee and not a mere licensee."

Whether or not the invitee stayed within the confines of the invitation is usually an issue for the jury. Even where the deviation was quite marked and an employee of a contractor on the property went upon land immediately adjacent under an alleged implied invitation, his right to do so was at least determinable by the jury. *Constantine v. Delaware, L. & W. R. Co.*, 12 *N. J. Misc.* 518 (*Sup. Ct.* 1934).

Under the circumstances here, where the plaintiff admittedly was invited upon defendant's premises and it is alleged he exceeded his invitation, the question whether the invitation was extended to that part of the premises where the accident occurred is one for the jury. *Hendrikson v. Koppers Co., Inc.*, 11 *N. J.* 600 (1953).

*Berley v. Eastern Coal Dock Co.*, 95 *N. J. L.* 517 (*E. & A.* 1921), and *Furey v. New York Cent. & H. R. R. Co.*, 67 *N. J. L.* 270 (*E. & A.* 1902), are cited and discussed in both briefs as bearing upon the general problem of invitation. Both seem distinguishable. The first is factually similar as to the coal company's operation of a kick-back shunted car

by gravity, but the facts causing the injury complained of differed materially in all other respects. The plaintiff passed between two cars and admittedly "took a chance in going through," and the defendant had absolutely no knowledge they were upon the property, the court holding that the status of the plaintiff, under the most favorable aspects of the testimony, could rise no higher than that of a licensee, and all that the defendant was required to do was to refrain from a willful or wanton injury to him. As the defendant had not invited the plaintiff upon its property, and had no knowledge that he was there, it could not be said that the operation of the cars in the usual way upon its tracks and property could result in the infliction of any willful or wanton injury upon the plaintiff.

In the *Furey* case, *supra*, there was likewise an opening between the cars resulting "solely from the exigencies of the business transacted on the tracks, and had no relation to their use as passageways over the tracks." The court said:

"With respect to the openings themselves, it is an established fact that they resulted, not from design, but from the exigencies of the business transacted on the pier, and that they varied from day to day with the physical conditions that gave rise to them, *viz.*, the placing of each car opposite to a door in the side of the shed."

The case turned mainly on this point and the court emphasized it was "neither an exception to, nor a limitation of, the general doctrine of invitation, but only a specific application of it."

In the instant case the route used, the pathway traversed and the purposes employed did not vary or change. The situation had been constant for a considerable period of time and the only change was in the increase in the hazard by reason of the operation of the trains. The factual situation here is totally different.

When the plaintiff originally went upon the Pennsylvania dock to work, the coal cars were not being run on dumper No. 2. It was under repair and no hazard from its operation existed. Employees, electricians, carpenters and laborers

crossed over the tracks wherever it expedited their particular assignment, including the place opposite the passageway under the trestle where the accident occurred.

After working on dumper No. 2 for more than a month under these conditions, the plaintiff was taken from the job he was then doing and assigned to the machine shop on the main dock, some 200 or 300 feet from the Coleman shed, and thence to the marine dock, about 700 or 800 feet away. Although the testimony is not too clear in this respect, he apparently continued to cross the track at the same point after parking his car to go to the shed and to wash at the spigot, which was the only convenience on that side of the tracks supplied by the Pennsylvania for washing purposes. But prevailing conditions had changed without notice to the plaintiff. No. 2 dumper was in operation and cars were running frequently without his knowledge, the plaintiff asserts, and without advice or warning from the railroad company.

These factual circumstances, including the earlier crossings which were so frequent as to be a common experience, were elements to be considered in determining whether or not the Pennsylvania rendered the premises "reasonably safe"; while the criterion of conduct is defined, what constitutes the exercise of reasonable care is usually a question to be decided by the jury.

Reasonable care has a "relative significance." The real inquiry is what a prudent man would do under the circumstances, and experience becomes a factor in the application of the comparative standard.

"The term connotes such degree of care as is commensurate with the risk of harm, such as a reasonable man would under all the circumstances deem prudent to obviate the danger, known or reasonably foreseeable; and, where the evidence, assayed by reasonable minds, may lead to *bona fide* differences of opinion as to whether there has been an observance of that standard of care, the question is one for the fact-finding authority. The nature of the duty resting upon the defendants was a question of law; whether, in the circumstances, they rendered performance of that duty was a question of fact for the jury." *Niles v. Phillips Express Co.*, 118 *N. J. L.* 455 (*E. & A.* 1937).

Next it is argued the plaintiff was guilty of contributory negligence and assumed a known and obvious risk.

The question of contributory negligence is also ordinarily for the jury. To justify a judgment on such ground as a matter of law, the contributory negligence of the plaintiff must appear clearly and conclusively as a fact or as a necessary and exclusive inference that would be drawn by all reasonable men in the exercise of a fair and impartial judgment. In this posture of the evidence the rule is that where it is reasonably debatable as to whether or not the plaintiff exercised a degree of care commensurate with the risk of harm, the issue of contributory negligence is one for the triers of the facts. *Mellon v. Pennsylvania-Reading Seashore Lines*, 7 *N. J.* 415 (1951); *Bacak v. Hogya*, 4 *N. J.* 417 (1950). See also *Beck v. Monmouth Lumber Co.*, 137 *N. J. L.* 268 (*E. & A.* 1947); *Hyman v. Bierman*, 130 *N. J. L.* 170 (*E. & A.* 1943); *Flanigan v. Madison Plaza Grill*, 129 *N. J. L.* 419 (*Sup. Ct.* 1943), affirmed 130 *N. J. L.* 532 (*E. & A.* 1943); *Hansen v. Brown*, 123 *N. J. L.* 223 (*E. & A.* 1939); *Smith v. Adler's Millinery*, 122 *N. J. L.* 236 (*Sup. Ct.* 1939); *Robbins v. Thies*, 117 *N. J. L.* 389 (*E. & A.* 1936); *Gereghty v. Wagner*, 117 *N. J. L.* 174 (*E. & A.* 1936); *Barnett v. Atlantic City Electric Co.*, 87 *N. J. L.* 29 (*Sup. Ct.* 1915); *Albanese v. Central R. Co.*, 70 *N. J. L.* 241 (*E. & A.* 1903); *Brooks v. Consolidated Gas Co.*, 70 *N. J. L.* 211 (*E. & A.* 1903).

A recent pronouncement in reference to the application of the rule as it prevails appears in *Hendrikson v. Koppers Co., Inc., supra*, where the unanimous court held:

"Whether the plaintiff was at fault in failing to observe the hole or in walking upon the trench top at all is not for us to say. * * * A jury question was presented here."

In the case under consideration we think the evidence, to say the least, raised a question of fact which was "reasonably debatable" and concerning which fair-minded men might differ.

The rule as to the assumption of risk is quite similar and is enunciated in *Beck v. Monmouth Lumber Co., supra*,

and the many cases there cited. In *Hendrikson v. Koppers Co., Inc., supra,* we observed that although there is an obvious difference between contributory negligence and assumption of risk, there is a tendency to treat them as identical. Assumption of risk usually applies to the relationship of master and servant and may be used in other fields, but no matter where applied, the doctrine may involve no fault or negligence but rather entails the undertaking of the risk of a known danger.

The plaintiff here, as in the *Hendrikson* case, *supra,* denied knowledge of the danger, although there was conflicting evidence from which the contrary inference might be drawn. It was therefore not susceptible of disposition as a matter of law.

Next it is asserted the amendment to the pleadings allowed at the trial charging the Pennsylvania negligently failed to take the proper precautions for the safety of invitees upon its property was error as the amendment presented a new and different cause of action after the statute had tolled.

It is well-settled that an amendment will not as a rule be held to state a new cause of action if the facts alleged show substantially the same wrong with respect to the same transaction, or if it is in the same matter more fully or differently laid, or if the gist of the action or the subject of the controversy remains the same. *Russo v. Wright Aeronautical Corp.,* 1 *N. J.* 417 (1949).

Adjudged by this principle, we think it clear the amendment objected to did not state a new or different cause of action and was properly permitted.

The contention that, inasmuch as master and servant were sued jointly, the action against the master was predicated solely on the tortious conduct of the servant and there can be no verdict against the master as the servant was exonerated, was only advanced if it should be determined that the amendment previously discussed should not have been allowed. The conclusion being otherwise, the point falls.

Lastly, it is claimed this defendant was prejudiced by the plaintiff's being permitted, over objection, to explain

what he meant when he said he heard the dumper "in operation."

The full explanation had already been given in exactly the same language in another part of the record without objection and its repetition cannot possibly be construed to be prejudicial or harmful.

The judgment of the Appellate Division as to the Pennsylvania Railroad Company is reversed and the cause remanded to the Superior Court, Law Division, Middlesex County, with direction that the judgment entered therein in favor of the plaintiff against the Pennsylvania Railroad Company be reinstated.

## As to the Seaboard Coal Dock Company

In addition to the facts already stated, on his appeal from the judgment entered in favor of the Seaboard Coal Dock Company the plaintiff emphasizes that the contract between the Seaboard and Pennsylvania for the conduct of the coal-dumping operation on the dock by the Seaboard and its compensation were on the basis of tonnage of coal unloaded from the coal car.

It was also obligated to make repairs on the "actual machinery part" of dumper No. 2 and furnish the labor therefor, the Pennsylvania providing the necessary supplies and material and reimbursing the Seaboard for the expenses incurred, and the plaintiff contends the fact that the rider of the car was an employee of the Pennsylvania and not of Seaboard does not alter the legal situation. The appeal here is limited to alleged errors in the trial judge's charging of certain requests submitted by Seaboard.

We have difficulty in concluding from the evidence in this case that the plaintiff's injuries resulted from the operation of the coal-dumping machine controlled by Seaboard. The accident occurred on a track owned and controlled by the Pennsylvania, and the freight car which caused the injury was owned and in possession of the Pennsylvania and its employee at a point some 585 feet distant from where the Seaboard's operation took place, but nevertheless the trial

court submitted the question to the jury and fully instructed them that if the "Seaboard Dock Company violated any duty to the plaintiff from them and were negligent, they too would be jointly responsible if you find they exercised joint control with the Pennsylvania Railroad Company. * * *"

The evidence indicates quite clearly that once a coal car had been unloaded and nudged off the unloading platform, the car was in charge of a Pennsylvania Railroad employee, who could control its speed and, if necessary, stop it. We are doubtful if from that time on the Seaboard had further possession or control of the car and if in fact its responsibilities were not completed when it turned the car over to the Pennsylvania brakeman after the unloading had been finished and the movement of the car started.

The Appellate Division said, "The evidence does not inform us of the particular in which the Dock Company was remiss in the observance of that duty," and we experience the same difficulty. The trial court, however, left to the jury the question as to whether or not Seaboard had assumed a duty and was responsible.

Under these circumstances, we are in accord with the Appellate Division's conclusion that the alleged errors in the requests to charge as complained of "were not materially prejudicial to the plaintiff * * *" and that the verdict "upon the issues" is in accord with the credible evidence.

The judgment below as to the Seaboard Coal Dock Company is affirmed.

No. A–107:

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For affirmance*—Justice OLIPHANT—1.

No. A–108:

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For reversal*—Justice HEHER—1.