Robert GOODMAN, Plaintiff,

v.

STALFORT, INC., et al., Defendants,

and

GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,
Defendant-Third-Party-Plaintiff,

v.

The CAMDEN FIRE INSURANCE ASSOCIATION, Third-Party-Defendant.

Civ. No. 251–72.

United States District Court,
D. New Jersey.

April 26, 1976.

Mayer & Mayer by Abraham Mayer, Newark, N.J., and Edward M. Swartz, Boston, Mass., for plaintiff.

Enright, Bright & Porter by Stanley R. Bright, Bloomfield, N.J., for defendants Stalfort and Camden Fire.

McElroy, Connell, Foley & Geiser by William T. McElroy, Newark, N.J., for defendant Inland.

Haskins, Robottom & Hack by David L. Hack, Bloomfield, N.J., for defendant-third-party-plaintiff Great Atlantic & Pacific Tea Co., Inc.

## OPINION

BIUNNO, District Judge.

This suit, brought on diversity grounds, seeks damages for personal injuries sustained in the use of an inflammable fluid marketed for the specific purpose of igniting charcoal in an outdoor grill.

The defendant Inland Oil and Chemical Corp. (Inland) was the supplier who initially furnished the fluid to Stalfort, in bulk. The fluid was sold to one or the other of the Stalfort companies, which packaged the fluid in cans for defendant Great Atlantic & Pacific Tea Co., Inc. (A & P), which in turn marketed the product under its brand for retail sale. Plaintiff Goodman purchased the can of fluid from A & P.

In the late afternoon of a day in mid-June, 1970, Goodman, then 53 years old, set up a charcoal grill to cook steaks for expected guests. The grill was a rectangular one, a foot wide and two feet long, and perhaps 6 to 8 inches deep.

He set this up in his driveway on a picnic table in the sun near the rear of the house, and filled it "good and full" with charcoal briquettes he had bought at A & P that afternoon, along with the can of charcoal lighter fluid.

It was the first time he was using the grill; he had a round one before that he had used and lit charcoal fires in up to 5 times.

He then lifted the plastic cap of the can and began to sprinkle the fluid over the charcoal. The fluid did not come out fast enough to his satisfaction, so he took a

garden tool—a long-handled, four-tined fork—and used it to enlarge the openings in a plastic sprinkler set below the cap. He could not say how many holes the sprinkler had, or whether he pressed the fork through the cap or enlarged one of the holes. In any event, after this operation, he had made a large hole and the fluid came out quite freely, in a stream.

He poured the fluid, going back and forth over the charcoal to soak it all, using about half the contents of the can. He was not sure whether it was a pint can or a quart can. He then put the can down some distance away, waited a while for the fluid to soak into the charcoal, and then lit it in several places with a match.

The flames came up immediately, and satisfied that the fire was started, he went into the house to help his wife prepare the steaks. He came out ten to fifteen minutes later to check the fire, and it seemed to him to be out. He saw no flames, and passing his hand back and forth over the grill, there seemed to be no warmth, there was no heat to amount to anything. He did not poke or turn the charcoal to look underneath. Some of the briquettes on top were a grayish-white at the corners. In his prior experience with charcoal, he had observed that when the charcoal was fully burning, a whitish or grayish-white coating formed on the entire surface.

He then picked up the can again, and the moment he began pouring more fluid on the charcoal a flame shot up the stream of fluid and the can blew up in his hand. When he saw the can again later, three sides of the bottom had been forced open so that it was like a lid, and the formerly flat sides of the can were bulged out and rounded. The can itself was discarded by someone and it is no longer in existence or available for inspection.

When the can blew up burning fluid was expelled over Goodman's hands, arms, chest, thighs and shins. He rolled on the grass, but this did not put out the fire; and he then sprayed himself with water from a garden hose and put it out.

Goodman had read the cautionary instructions on the can. He remembers reading something like "Caution. Combustible Mixture." He read "Keep Away From Flame And Open Fire." He read "Do Not Add To Lighted Fire."

Goodman had completed high school and two years of pre-med courses in college, as well as extension courses in electronics, business management and purchasing. At the time of the occurrence, he was a salesman selling paint sundries, such as tools and brushes and had been for some 3.5 years. Before that he was a purchasing agent dealing in metals. Before that he was a laboratory technician for stress-rupture testing of high-temperature metal alloys. Before that he had worked in and managed a scrap metal yard, and before that as a time-study clerk for a metals manufacturer.

The foregoing account is summarized and condensed from the examination of Goodman on oral deposition taken November 17, 1972.

The court now has before it a number of motions by various parties, which have been submitted and the disposition of which is as follows.

## A. A & P's MOTION FOR SUMMARY JUDGMENT.

A & P claimed a right of indemnification from Stalfort and filed a third-party complaint against Stalfort's carrier, The Camden Fire Insurance Association to have the benefit of its coverage on Stalfort extended to it, which included taking over and defending A & P under the public liability policy with broad form vendor's endorsement (Policy No. 36 794 97).

As to Stalfort, the judgment sought is to take over, defend and save harmless A & P in regard to Goodman's claim, and to reimburse A & P its reasonable expenses incurred until then.

As to Camden, the judgment sought is to include A & P as an additional insured under the broad form endorsement and otherwise for the same relief sought against Stalfort.

This same motion had been made previously and denied on December 4, 1973 without prejudice to renewal at pretrial. It was then renewed, but disposition was continued to afford Stalfort and Camden an opportunity to complete discovery on this issue. That discovery has now been completed and the motion renewed.

At pretrial, Stalfort and Camden were directed to notify A & P whether or not they resisted the motion. They have evidently not done so, but the renewed motion is unopposed. The terms of the indemnification agreement are clear and applicable. The court finds that there is no genuine issue on any material fact, and that A & P is entitled to judgment as a matter of law. F.R.Civ.P. 56.

A & P shall submit a form of judgment for entry, with copies to Stalfort and Camden. If either has objections as to form, a substitute version shall be submitted and served within 10 days of mailing of A & P's form, and the court will resolve any differences.

## B. STALFORT's AND INLAND's MOTIONS FOR SUMMARY JUDGMENT.

Stalfort and Inland have moved for summary judgment against Goodman. First, they assert that Goodman's own testimony, adduced on the depositions, shows that he was guilty of contributory negligence as a matter of law. Since the occurrence took place in 1970, the common law rule barring recovery where there is contributory negligence governs the case. The statute altering that rule to the rule of comparative negligence, L.1973, c. 146; N.J.S.A. 2A:15–5.1 et seq., was expressly stated to apply to causes of action arising on and after 90 days from May 24, 1973 (sec. 4 of c. 146).

Second, they assert that the testimony of Goodman's only expert witness, Jon R. Kelly (a) is inadmissible for lack of expertise in the proper field, and (b) shows that the product and can as sold to Goodman was properly designed, and that Goodman's act in making a large hole for easier pouring destroyed the effectiveness of the recognized safety device on the can.

On the first aspect, there is no doubt that Goodman's testimony discloses contributory negligence; the issue here is whether it so clearly appears therefrom as to amount to contributory negligence as a matter of law. Was Goodman's conduct such as to "invite calamity" by proximately making himself "the instrumentality of his own injury"?

Taking the evidence which Goodman would be bound with at trial in its most favorable light, the court is satisfied that it clearly and convincingly shows proximate causative contributory negligence as a matter of law. There is no escape from this conclusion.

First of all, Goodman said he read the statements on the can: "Caution. Combustible Mixture"; "Keep Away From Flame and Open Fire"; "Do Not Add To Lighted Fire." Despite this awareness, he did precisely what the warnings told him not to do: he took a combustible mixture and added it to a fire that he had lighted 10 to 15 minutes before. As was said long ago in a related context, "he did not look, or, looking did not heed what he saw." *Pennsylvania R. R. Co. v. Righter*, 42 N.J.L. 180, at 187 (E & A 1880).

He knew that charcoal is black, and that as it burns a whitish or greyish-white coating (ash) forms on the surface; when he came out to look at the grill, he saw that the briquettes "were mostly black"; the part that was not black was "around an occasional corner [where] it was greyish-whitish." What he saw told him that those parts were burning, but he did not heed what he saw and added a combustible mixture to a lighted fire, contrary to the instructions on the label which he had read. This act, by itself, is obviously contributory negligence as a matter of law.

If that were all he did, the newly-added fluid would have flared up in a "whoosh" and would also have ignited the vapors around the surface of the stream of fluid back to the can, but the can would not have "blown up" in his hand. Depending on where he was standing and how much fluid he added, he could have been burned,

though probably less severely than he was. The testimony of his own expert, both in his report and in his deposition, establishes that the type of can involved was adequate to prevent "flashback" [into the can], and [the explosion] wouldn't have happened if he had not tampered with the holes.

Thus, the second thing Goodman did, aside from adding a combustible fluid to a lighted fire, was to punch a large hole so that the fluid would flow rather freely. Whether or not he was aware that the use of smaller holes was designed to protect against a "flashback" into the can is beside the point. He knew, from when he punched the hole and poured the fluid before lighting the fire, that the larger hole would pour more combustible mixture, and hence increase the danger inherent in the use of any combustible mixture. He knowingly increased the risk or hazard and thereby invited calamity; he proximately made himself the instrumentality of his own injury.

■ In New Jersey, it is settled law that the submission to a jury of the question of contributory negligence, when that negligence appears as a matter of law, is merely procedural, and a statute directing that the issue be so submitted cannot serve to support a verdict for plaintiff when it clearly appears that there is contributory negligence as a matter of law. *Siegler v. Norton,* 8 N.J. 374, at 381–383, 86 A.2d 8 (1952). Absent a statute like that there involved, which did nothing more than postpone the court's ruling until after verdict, it is clear on the facts of this case, taking the testimony of Goodman and his expert in its most favorable light, that the case could not go to a jury, and if it did a verdict for Goodman would be set aside. The factual account and analysis so far expressed is more than sufficient to support the determination. Beyond that, there are matters that would be judicially noticed in this context at a trial which strongly reinforce the conclusion reached.

■ Charcoal has been known to man for a long time, and is probably one of his earliest artifacts after the discovery of fire. Although also prepared from animal bone, sugar and coal (coke), its commonest form is prepared from wood. From a remote period, in areas where there is an abundance of wood, as in the forests of France, Austria and Sweden, it was customary to stack billets of wood into a conical pile, cover it with turf or moistened soil, and then burn the wood slowly in a restricted amount of air. This drives off more volatile materials, such as acetone, wood-tar, and the like, leaving a porous carbon, the major use of which is as a fuel that burns with considerable heat and with little or no smoke or odor. See, *The Encyclopaedia Brittanica* (11th Ed.), Vol. 5, "Carbon", p. 305, and "Charcoal", p. 856.

The antiquity of the occupation of making charcoal from wood is evidenced by the references in old fairy tales to "charcoal burners", who live in a "great forest". See, for example, "The Knapsack, the Hat and the Horn", in *Kingston,* "Fifty Famous Fairy Tales", (Whitman Publishing Co., Racine, Wis., 1917) at pp. 143–145.

Today, of course, the destructive distillation of wood is carried out more efficiently, with the wood being heated in closed retorts without access to air, and the many useful by-products driven off are captured and separated (e. g., creosote, acetone, acetic acid, wood alcohol, etc.) leaving the charcoal as the residue. See, *Dull,* "High School Chemistry" (Henry Holt & Co., New York, 1925), § 182.

Until recent decades, charcoal sold at retail for use in cooking on grills came in the form of irregular pieces of varying sizes that retained the shape of the pieces of wood from which it was made. In its modern form, it is first powdered and then shaped into square, rounded pillows called "briquettes" of uniform size.

Igniting charcoal has traditionally consisted of first making a layer of twisted paper, wood chips, "kindling" wood, and the like, placing the charcoal on top, and then

lighting the paper with a spill, a long wooden match, or the like. The easily ignited paper lights the kindling, and the heat from that ignites the charcoal. When the charcoal is ignited, it forms a greyish-white coating of ash since the combustion occurs at the surface (where the carbon is in contact with air) and continues burning toward the interior.

Impatience or difficulty with the traditional method led to the marketing of charcoal lighter fluid. Many users had for years employed substances such as cigarette lighter fluid, kerosene and alcohol as liquid fuels to ignite the charcoal more easily. Modern commercial fluids marketed for the purpose are less dangerous than these makeshift methods, and are essentially odorless as well.

In any case, the building of a charcoal fire, as with a log fire, involves going from a cold fuel to a fuel sufficiently heated to sustain its own combustion. The rate at which the charcoal passes from the cold state to the fully heated state depends on obvious variables. Enough air must pass through the bed to sustain and expand combustion. Too much air will cool the bed; too little air will fail to sustain the fire. The quantity of fuel is another factor. If there is too little, much of the heat will be lost by convection and ignition will not spread. If there is too much, the mass of charcoal will require a longer time to heat up to combustion.

But at any stage of the process, from the lighting of the fire on, if there is any combustion occurring anywhere in the bed, it is a "lighted fire", and the addition of a flammable material, such as was done by Goodman, is certain to result in an instantaneous flare-up of the volatile liquid coming in contact with burning charcoal.

These are all matters of such common knowledge that the court feels obliged to take judicial notice of them. Under the formulation of Fed.Ev. Rule 201, it is by no means clear whether these are "adjudicative facts", or what the Advisory Committee's Note confusingly calls "legislative facts." In either case, these facts are so well known and not open to challenge as to require that they be judicially noticed.

But, argues Goodman, a genuine issue of a material fact remains, in that the instructions and cautions on the label of the can of fluid did not say: "Do Not Tamper With Sprinkler Disk Under Cap", or "Do Not Punch Hole(s) or Enlarge Hole(s) in Sprinkler Disk", or some such expression. This alleged lack of warning, it is argued, raises a question for a jury and precludes entry of summary judgment. The argument is without substance.

In the first place, the theme goes only to show negligence or mislabeling by Stalfort and A & P. Assuming this were accepted as a rational finding, it utterly fails to wipe out Goodman's contributory negligence in adding fluid to a fire he should have known was lighted if he had heeded what he saw—and the label not only warned against that, but Goodman remembers reading it.

In the second place, while wording like that referred to was not used (a fact not in dispute), no genuine issue can arise on the point for several reasons. One is that Goodman's expert admits he has no qualifications in regard to labelling; and so his opinion on that subject would not be received in evidence. The other is that in the context of this case and this accident, the adequacy of the labelling, taken as a whole, leave no room for Goodman's contention. The flaw is that the theme is directed to the wording, while what controls is the meaning of the wording that is there. The theme comes down to a matter of semantics, and its implication is that no wording would be satisfactory unless it dealt explicitly with every conceivable way in which the product might be misused, despite adequate labelling and despite the commands of common sense.

The ways in which a product might be misused are, like the stars, an endless num-

ber.[1] The theme, if accepted, would require knives to be labelled: "Caution: Keep All Parts of Body Away From Cutting Edge and Point." Gasoline caps on cars would need a label: "Warning: Do Not Check Gas Level With Lighted Match or Candle."[2] Steering wheels, in most countries, would need a label: "Caution: Do Not Drive On Left Side of Road". The list would be endless, and would soon use up the available space for labelling.

The futility of the theme is evident. Suppose there had been a warning not to enlarge or punch holes in the sprinkler disk, and suppose Goodman had simply removed it; could it then be claimed that the warning was inadequate? Or suppose he had punched an air hole in the top of the can itself, opposite the spout; this, too, would have caused the fluid to flow freely. Would there have to be a separate warning for that?

No matter how many ways a skillful draftsman might imagine that someone would misuse or abuse the product, and prepare cautions or warnings, the permutations and combinations are so vast that someone would find a way not anticipated. To meet the implications of the theme, the only complete legend (perhaps) would be: "Caution: Keep Refrigerated. Do Not Open. Do Not Use."

█ On the facts presented with the motions, taken in their most favorable light to Goodman, no legal basis for recovery against Inland appears. Inland is a mere distributor who received and filled an order for one or more tank cars of the fluid in bulk, usually about 7,000 gallons. Nothing is presented to show that Inland supplied a different fluid than what was ordered. If the order were for "Soltrol 130" (the fluid involved), and Inland had sent some other fluid that was more volatile, more inflammable, with a lower ignition point or flash point, there might be some basis for a claim against Inland.

See, for example, *Flexmir v. Lindeman,* 4 N.J. 509, 73 A.2d 243 (1950); 14 N.J.Super. 379, 82 A.2d 450 (App.1951); 8 N.J. 602, 86 A.2d 585 (1952); and "A Case In 'Flash Point'", *Jurimetrics Journal,* Summer, 1973, p. 226. In that case a fuel oil dealer who had serviced his customer once or twice a week for several years with supplies of Bunker C or Number 6 fuel oil, delivered a quantity of Number 2 fuel oil. Since the heavy oils must first be run through a preheater the dealer was charged with awareness that the much more volatile Number 2 fuel oil would be vaporized in the preheater, thereby destroying any metering control in the pump and burner nozzle. The inevitable explosion and fire followed.

No such element is present here. There is no fact to even suggest by a scintilla that the fluid in the can was anything other than it should have been. Under these circumstances, if Inland could be held liable, so could the railroad that delivered the shipment, the refiner who produced the fluid, and the Texan, Arab or Venezuelan whose well produced the crude petroleum.

█ In this analysis, Stalfort and A & P are treated as one. Stalfort undertook and was responsible for both the packaging and the labelling. A & P merely had its brand on the label and sold the product as packaged and labelled by Stalfort. What has been said about Stalfort applies equally to A & P, and it is entitled to indemnification from Stalfort and its insurer. The result as to one is no different than the other. As to

---

1. "If, my dear, you seek to slumber,
   Count of stars an endless number;
   If you still continue wakeful,
   Count the drops that make a lakeful;
   Then, if vigilance above you
   Hovers, count the times I love you;
   And if slumber still repel you,
   Count the times I did not tell you."
     Franklin P. Adams, *Lullaby,* The Home Book of Quotations (Dodd, Mead & Co., New York, 1947), p. 1851.

2. An old sea chanty has a parody, going back some 50 years, that runs:

   "My bonnie leaned over the gas tank,
   The height of its contents to see;
   She lighted a match to assist her—
               BOOM!
   Oh, bring back my bonnie to me"
                           —*Anon.*

both, not only is there a clear-cut instance of contributory negligence as a matter of law, but there is no showing of any facts to support liability on the part of any defendant. If the current statute on comparative negligence applied, the allocation would be 100% to Goodman and zero to the defendants.

C. THE APPLICABLE LAW. Since this is a diversity case, the controlling law is that of New Jersey where the incident occurred.

Reference has already been made to the decisions in *Pennsylvania R. R. Co., Siegler* and *Flexmir, supra.* It remains to review more fully the law of New Jersey in regard to "contributory negligence as a matter of law", and the way that the local law has been interpreted in this circuit.

New Jersey decisions in which a claimant's conduct was held to constitute contributory negligence as a matter of law include *Schwanewede v. No. Hudson Ry. co.,* 67 N.J.L. 449, 51 A. 696 (S.Ct.1902); *Saunders v. Smith Realty Co.,* 84 N.J.L. 276, 86 A. 404 (E & A 1912); *Card v. Carrigan,* 137 N.J.L. 722, 61 A.2d 263 (E & A 1948); *Bratka v. Castles, etc.,* 40 N.J.Super. 576, 123 A.2d 793 (App.1956); *Ferrie v. D'Arc,* 31 N.J. 92, 155 A.2d 257 (1959).

In this circuit, the Court of Appeals has analyzed the principles of State law by pointing out that to hold a plaintiff contributorily negligent as a a matter of law, that negligence must appear clearly and conclusively as a fact, or as a necessary and exclusive inference that would be drawn by all reasonable men in the exercise of fair and impartial judgment. *Saporito v. Holland-America Lines,* 284 F.2d 761 at 765 (CA3, 1960), citing *Gudnestad v. Seaboard, etc.,* 15 N.J. 210, 104 A.2d 313 (1954) and earlier cases.

In *Saporito,* the issue was somewhat obscured by a contention that plaintiff had "assumed the risk" of injury when he removed a prop for an overhead door that he knew had been damaged so that it could only be raised and lowered with difficulty. Removal of the prop was found not sufficient knowing conduct to bar recovery be-

cause what occurred was something entirely different—the complete collapse of the door in its raised position, by leaving its guide tracks entirely, rather than difficulty of movement in the tracks.

As Judge Forman aptly observed in that case, the New Jersey decisions in which contributory negligence was found to bar the claim as a matter of law were cases in which the plaintiff "invited calamity" by consciously in some proximate degree making himself "the instrumentality of his own injury" in the face of a known danger. 284 F.2d at 766. That is this case.

*Ferrie,* decided before *Saporito* but not mentioned there, is in accord with Judge Forman's analysis. As Mr. Justice Francis there noted, referring to another decision, "He knew the danger, but did not keep it in mind. Was his forgetfulness an excuse?" This is but another expression, equivalent to that in *Pennsylvania R. Co., supra,* "he did not look or, looking, did not heed what he saw".

This is not a case coming within one of the recognized exceptions. No fact advanced suggests a basis for claiming wanton or wilful misconduct on the part of any defendant, as in *Camden, etc. v. Preston,* 59 N.J.L. 264, at 266–267, 35 A. 1119 (E & A 1896), cited and followed in *Tabor v. O'Grady,* 59 N.J.Super. 330, at 340, 157 A.2d 701 (App.1960). Nor is it a case of a plaintiff child of tender years who cannot be expected to be aware of the dangers and the consequences. See *Schneider v. Winkler,* 74 N.J.L. 71, 70 A. 731 (S.Ct.1906); *Bush v. N. J. & N. Y. etc.,* 30 N.J. 345, 153 A.2d 128 (1959).

■ The fact that the complaint here, based on the same set of facts, asserts theories of recovery based on strict liability in tort and breach of warranty as well as negligence does not alter the matter. The bar of contributory negligence is equally applicable under those theories; it has been so ruled in *Maiorino v. Weco Products Co.,* 45 N.J. 570, 214 A.2d 18 (1965), and *Bexiga v. Havir Manufacturing Co.,* 60 N.J. 402, 290 A.2d 281 (1972).

Applying the test for summary judgment as interpreted in this circuit, the court finds that there is no genuine issue as to any material fact, and that Goodman's conduct was the proximate cause of his own injury constituting contributory negligence as a matter of law.

### D. GOODMAN's MOTIONS FOR FURTHER ANSWERS TO REQUESTS FOR ADMISSIONS.

Goodman has filed motions directed to Inland, Stalfort and A & P, to compel further answers to 16 requests for admissions. The court has reviewed the requests and the answers, and finds that they are either adequately answered or properly objected to. The requests were served a considerable time back, and the normal period for discovery has long since expired. The requests served by Goodman numbered well in excess of 600, and no question of adequacy was raised at the pretrial conference. Nor would any of the requests tend to adduce any fact that would alter the result arrived at on the motions for summary judgment.

### E. DIRECTIONS TO THE PARTIES.

A & P is to submit a form of summary judgment against Stalfort on its crossclaim and against Camden Fire on the third party complaint. Those parties will have 10 days from mailing to them in which to submit another version if they desire, and the court will resolve any differences.

Summary judgment against plaintiff and in favor of the defendants will not be entered until May 31, 1976. Until then, Goodman has leave to point out any fact in the record, or otherwise adduced, tending to show the existence of a genuine issue that calls for jury resolution, in the light of the matters judicially noticed and the ruling above noted in regard to the lack of qualification of Goodman's expert witness in regard to labelling. Goodman may also address the propriety and tenor of any matter judicially noticed, Fed.Ev. Rule 201(e).

The foregoing opinion constitutes the court's findings of fact and conclusions of law.