67 N.J. Super. 305 (1961)
170 A.2d 437
MARY MILLER, ADMINISTRATRIX AD PROSEQUENDUM OF RUSSELL MILLER, DECEASED, PLAINTIFF-APPELLANT,
v.
JOSEPH L. MUSCARELLE, CHARLES W. MUSCARELLE, GEORGE FIELDS, AND ARTHUR FOWLER, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 14, 1961.
Decided May 1, 1961.
*309 Before Judges CONFORD, FREUND and KILKENNY.
Mr. Raymond Chasan argued the cause for appellant (Messrs. Warren, Chasan and Leyner, attorneys).
Mr. Theodore W. Geiser argued the cause for respondents Joseph L. Muscarelle and Charles W. Muscarelle (Messrs. Shaw, Pindar, McElroy, Connell and Foley, attorneys).
Mr. James A. Major argued the cause for respondents George Fields and Arthur Fowler (Mr. James I. Toscano and Mr. James A. Major, II, attorneys).
The opinion of the court was delivered by CONFORD, S.J.A.D.
Plaintiff brought this action in her representative capacity, seeking damages for the wrongful death of her intestate, Russell Miller, who died September 4, *310 1956 in an accident while working as a laborer on a construction project being executed by his employer, Jos. L. Muscarelle, Inc., at Paramus. The employer is not a defendant, having discharged its legal obligation to the family of the decedent in accordance with the Workmen's Compensation Act, R.S. 34:15-1 et seq.
The defendants here are Fields, foreman of the labor crew of which Miller was a member when the accident occurred; Arthur Fowler, manager in over-all charge of the particular construction project; Charles W. Muscarelle, general superintendent on the job but under Fowler in authority thereon, although a director, officer and stockholder of the corporate employer; and Joseph L. Muscarelle, president, executive head and principal stockholder of the corporation. It is claimed by plaintiff that all of these were in one respect or another chargeable with negligence causative of the fatal accident and therefore individually liable to the plaintiff in tort for damages in compensation for the wrongful death. Plaintiff assented to an involuntary dismissal as to two other stockholder-executives of the concern, Burghardt and Collins, originally made defendants. At the conclusion of plaintiff's proofs the trial court granted motions for involuntary dismissal as to all the remaining defendants. This appeal is from that ruling.
The construction job here involved was the erection of a large shopping center known as the Garden State Plaza. The particular unit at which the accident took place was the Bamberger Building, a two-story structure. On the day of the accident the brickmasons had erected a wall to a height of about 15 feet. Brick and mortar were to be carried to them by means of a portable conveyor described as 30 to 40 feet long, perhaps two feet wide, mounted on a wheel-carriage located at the rearmost end. Its main section consisted of an endless belt driven by a small gasoline engine. The rig as a whole did not, however, move under its own power, but required hauling, towing or manual pushing to relocate it as need would dictate. The conveyor apparatus *311 proper was mounted on a boom. Raising and lowering of the conveyor's front end was accomplished by means of a hand winch at the rear end, from which cables ran to and around small steel dolly-wheels at the end of the boom. The underframe of the conveyor proper provided a "track" upon which the dolly-wheels might roll. Winching the cable in would raise the boom and the front end of the conveyor.
It became necessary, the day of the accident, to move this machine up a ramp to a platform four feet above ground in order to feed materials to the masons high on the wall. Fields directed a gang of men, including Miller, to roll it up the ramp. There was testimony that Fields, himself, participated in the pushing of the rig. The number of men so engaged is variously estimated at seven to twelve, equally distributed between both sides. Miller was on the right side, near the wheels. The wheel carriage of the conveyor had reached the foot of the ramp and may have just begun the ascent, when the conveyor itself, then at its front end about 15 feet above ground, suddenly collapsed, crushing Miller to death.
Fields testified on depositions at the call of plaintiff and explained the event:
"Q. In order to pull or push this thing up the ramp, where did you station the men with respect to the length of the conveyor?
A. In a position that you could elevate that conveyor in a degree where the conveyor can balance itself.

* * * * * * * *
Q. What happened. A. * * * what I saw happen, pushing it, the fellows on the left hand side got ahead of the ones on the right, causing the conveyor to twist, and on that twist it caused the conveyor to jump the track and collapse. * * * when the cable was loose on the twist (indicating) it jumps the track.

* * * * * * * *
* * * I said it twisted; that slackened the cable and made it jump the track."
The theories upon which plaintiff postulates negligence of these defendants are: (a) as to Fields, that the moving *312 of the conveyor by manpower was a dangerous maneuver and that he was negligent in ordering it to be done and in failing to secure the conveyor proper to the boom while moving it (the latter specification was not charged in the pretrial order); (b) as to Fowler, that as project manager he should not have assigned Fields to the equipment in view of the latter's alleged insufficient training with and knowledge of the proper method of moving it and without instructing him how to do so safely. It is also asserted Fowler had a duty under the statutory safety code, R.S. 34:5-1 et seq., 34:5-4, 35:5-161, to install safeguards for the operation of the machine, default in which made him liable to one harmed by the breach of duty (the latter claim was not made in the complaint, pretrial order, or at the trial). (c) As to Charles Muscarelle, that he was negligent in failing to inform himself as to the safe use of the conveyor and the competency of Fields to handle it; (d) as to Joseph Muscarelle, that as executive head he should have informed himself as to which employees were proficient in the use of the equipment and seen to the institution of a safety program which would have checked the qualifications and training of subordinates to handle potentially dangerous equipment.

I.
By testimony and depositions introduced in evidence plaintiff submitted proofs which, in their most favorable light to her case, could have supported findings that the activities of the defendants in relation to the work here involved and to each other were as follows:
1. As to Fields. He had been employed by the company about ten years, originally as a laborer, and for about seven to eight years as labor foreman. He had no technical training and less than a grammar school education. He worked only on one particular project at a time, while the company generally had four or five other projects going *313 on at the same time, as was the case when Garden State Plaza was under construction. But this was the largest project then being executed by the company.
There were four or five supervisors on the Garden State Plaza, each covering a different area. The supervisor in charge of the area in which plaintiff's decedent and Fields were working at the time was one Kinzley, who was not made a defendant. It was Kinzley who had told Fields to work at that part of the building at the time of the accident. Above Kinzley in authority was Charles Muscarelle, as "general superintendent" on the job, and above Muscarelle was Fowler, project manager. The personnel in this "chain of command" were assigned by Fowler.
Fields knew, without being expressly told, that he was to have the conveyor brought to the wall and to erect the ramp so that the conveyor could be brought up within reach of the top of the wall. It was the function of the union shop steward, not of the company supervisors, to approve the construction of the ramp. Fields had executed such maneuvers before. He had used the conveyor many times before, always having moved it from place to place by manpower. No one told him to do it in that or any other way. He was apparently never provided with equipment to move it in any other manner.
Fields was in charge of all common labor on the project. He regarded Fowler as his "boss" and saw him every day, but received no direct orders from him. He also saw Charles Muscarelle on the job from time to time but received no orders or directions from him either. There were from time to time office conferences under Fowler scheduling construction progress for a period of time ahead. Fields said there was a "safety man" on the job but he could not identify him; see discussion as to Joseph Muscarelle, infra.
2. As to Charles Muscarelle. His general status has been described. His function was "expediting and coordinating the work" as a whole, and he was in attendance every day. He knew the conveyor was there but had never seen it *314 moved. He did not know its size or specifications but knew in a general way how it worked. He had limited technical training, but, at 37, had been engaged in the construction business his entire career.
3. As to Fowler. His general status has been described. He was the senior executive in the field. He described his duties as "primarily from a coordination standpoint, a scheduling and office administrative standpoint." He knew there was a conveyor in use on the project and that it was the only one the company owned. He had no concern with detailed construction operations and did not know that the ramp was built or that the conveyor was to be moved onto it. He knew nothing about the need for the specific fatal maneuver. It might have been a week or two before the accident since he was last at that part of the project. His knowledge of the execution of the job did not extend to specific daily progress.
4. As to Joseph Muscarelle. He never supervises in the field. He produced records which showed the conveyor had been purchased in June 1953. He gives final approval to purchases of larger pieces of equipment. Requests for such equipment go through "the various chain of command." He knew nothing of the history of "this particular piece of equipment" (conveyor). There was no person "that was designated as a safety engineer" on the Garden State Plaza project. This testimony is not fairly understandable without the further explanation given by the witness, omitted in the reading of the depositions for obvious reasons, "none other than what the insurance company furnishes us." Apparently the only trained engineers in the concern were Collins and Burghardt, but they did not supervise in the field. Joseph Muscarelle knew the conveyor was being used on this project and that it had to be moved from place to place, but was not familiar with the fact it might have to be moved to higher levels.

*315 II.
A fair appraisal of the facts requires giving consideration to two categories of evidence offered by plaintiff but excluded by the trial court. The first related to a prior accident with the conveyor, the second to proposed expert testimony.
Plaintiff sought to adduce the testimony (by proffer, although he was not actually sworn) of one Polito, a laborer formerly employed by the company, who, it purportedly would have been shown, was severely injured in July 1954 when this same conveyor collapsed and fell on him at another construction project in the same manner as befell Miller, while it was being pushed by manpower preparatory to mounting a ramp. There, however, the rig had not yet reached the foot of the ramp (so we are now informed by counsel for plaintiff, although a contrary implication appears in counsel's questioning of Fowler on depositions). On objection, the trial court excluded the proof on the sweeping ground that a prior accident may not be shown to prove negligence, citing Debes v. Morganroth, 48 N.J. Super. 39 (App. Div. 1957). Under the same ruling, references in the depositions of Fowler and the Muscarelles as to the existence of knowledge of the prior accident were excluded when they were offered in evidence. These would have shown (we have examined the original transcript) that Fowler was informed of the 1954 accident when it occurred. He was not project manager of that job but was general superintendent of the company when the prior incident took place. He was not apprised of the particulars. He reported the accident to the insurance company (presumably compensation carrier) but not to Joseph Muscarelle. Joseph Muscarelle categorically denied knowledge of any prior accident involving the conveyor. This statement was admitted in evidence without objection. Charles Muscarelle, in deposition testimony excluded at the trial, said he did not "remember" the prior accident and seriously doubted that he ever attended that job site.
*316 Plaintiff sought to adduce the testimony of a business agent of the laborers' union, one Priscoe, who counsel now tells us would have testified, if allowed, that after the prior accident he complained to the foreman and superintendent of that job that the conveyor should have been moved only by a power mechanism. The exclusion of this proof by the trial judge was patently not error, apart from the consideration of its relation to a prior accident, since (a) Priscoe was not an expert and (b) any conversations he had with other employees were not binding upon or chargeable as notice to the present defendants.
Plaintiff attempted to qualify two alleged experts on conveyors so as to elicit opinions that standard practice for the safe movement of such equipment as this was by mechanical power, not manpower. This was to sustain plaintiff's burden of establishing a failure by defendants to conform with a standard of reasonable care in the use of the conveyor. One of these experts, one McCoy, a licensed mechanical engineer, claimed to have had experience in the movement of conveyors of this type, but not more recently than 24 years previously. It appeared, however, that while he had supervised such movements in industry, he had been present only twice when such a movement had taken place. Plaintiff defended his qualifications primarily on the basis of his scientific knowledge. We are satisfied that the rejection of this witness was well within the discretionary judgment of the trial judge under the rule which places the control over such proofs largely within the discretion of the judge. Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 411 (1960); Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 141 (1950).
The other witness proffered as an expert, one Green, had had 17 years of occupational experience as a rigger, including the handling of precisely such equipment. For ten years or more, moreover, he had had frequent occasion personally to direct and supervise the movement of conveyors like this one from place to place. His testimony was excluded *317 on the sole ground that his experience with conveyors was not in the construction industry. This does not impress us as a justifiable basis for the disqualification of the witness, insofar as reasonable care in the use of such equipment may have been regarded as an issue in the case. The extensive experience of the man with such equipment was undeniable. Plaintiff was sorely dependent upon such proof. No reason is shown why standards or principles of safety in the movement of conveyors over terrain in one industry should be inapplicable to a similar movement in another industry. Expert testimony is admissible or not accordingly as the witness offered has or has not peculiar knowledge or experience not common to the world, such as would render his opinion founded on such knowledge or experience helpful to the court or jury in determining the questions at issue. Rempfer v. Deerfield Packing Corp., supra (4 N.J., at pp. 141, 142). See also O'Donnell v. Asplundh Tree Expert Co., 13 N.J. 319, 340-341 (1953); Keaveney v. Newark Ladder & Bracket Co., Inc., 23 N.J. Super. 99, 102 (App. Div. 1952). For fact situations comparable to the instant case where such opinions were considered helpful and admissible, see Excelsior Electric Co. v. Sweet, 57 N.J.L. 224, 229-231 (Sup. Ct. 1894), reversed on other grounds, 59 N.J.L. 441 (E. & A. 1896); Schnoor v. Palisades Realty, etc., Co., 112 N.J.L. 506, 508 (E. & A. 1934); Carver v. Missouri-Kansas-Texas R. Co., 362 Mo. 897, 245 S.W.2d 96, 103 (Sup. Ct. 1952); Consolidated Stone Co. v. Williams, 26 Ind. App. 131, 57 N.E. 558, 559 (App. Ct. 1900); Roberts v. Vroom, 212 Mass. 168, 98 N.E. 687, 688 (Sup. Jud. Ct. 1912); Maxson v. J.I. Case Threshing Mach. Co., 81 Neb. 546, 116 N.W. 281, 285-286, 16 L.R.A., N.S., 963 (Sup. Ct. 1908); Hamner v. Janowitz, 131 Iowa 20, 108 N.W. 109, 110 (Sup. Ct. 1906). See also, generally, Annotations 62 A.L.R.2d 1426 (1958), 146 A.L.R. 5 (1943).
As will be seen, infra, however, the trial action in withholding this case from the jury was correct even upon an *318 assumption of the admission of the opinion of the expert Green. The rejection of this testimony will therefore not require a reversal.
The challenge of the court's exclusion of all proofs of or references to the prior accident raises a type of legal problem which has given our courts and others considerable difficulty. It has recently been stated by this court that "proof of a previous mishap similarly occasioned is not admissible to demonstrate the dangerous nature and character of the condition." Debes v. Morganroth, supra (48 N.J. Super., at p. 45; emphasis by the court). There the dangerous condition was a door, in a dwelling, opening on cellar stairs, which a guest assumed opened to a bedroom. The rule as there stated is grounded in many prior decisions so holding on the policy basis of avoiding confusion of issues, excessive consumption of time, and inordinate prejudicial effect. Ibid.; Bobbink v. Erie Railroad Co., 75 N.J.L. 913 (E. & A. 1908); Crouse v. Stacy-Trent Co., 110 N.J.L. 124 (E. & A. 1933); Vander Groef v. Great Atlantic & Pacific Tea Co., 32 N.J. Super. 365 (App. Div. 1954). Side by side with the rule stated, however, stands the principle that a prior accident may be proven if calculated to show the subsistence of a specific condition long enough to bespeak notice thereof to the owner or occupant, or to show the fact of actual notice. Alcott v. Public Service Corporation, 78 N.J.L. 482, 486 (E. & A. 1909); Schwartz v. Howard Savings Institution, 117 N.J.L. 180, 183 (E. & A. 1936); Dolan v. Newark Iron & Metal Co., 18 N.J. Super. 450, 456-457 (App. Div. 1952); cf. Zizi v. Gabriele d'Annunzio Lodge No. 22, 14 N.J. Super. 200, 203-204 (App. Div. 1951). Proof admissible for the latter purposes may be received with cautionary instructions against using it for the improper purpose. Dolan, supra, 18 N.J. Super., at p. 456.
Wigmore (2 Evidence (3rd ed. 1940), § 458, p. 473) and McCormick (Evidence (1954), § 167, p. 350) take the view that since a prior instance of a deleterious effect of a thing, *319 condition or machine may logically generate an inference of a harmful tendency or capacity of the thing, etc., such evidence ought to be admitted for that purpose, subject only to the trial court's estimate as to whether the likelihood of confusion of issues, unfair surprise or undue prejudice would be disproportionate to the probative usefulness of the evidence. McCormick attributes this view to most courts, ubi cit., supra, and the thorough survey of the authorities in Annotation 70 A.L.R.2d 167, 194 (1960) would seem to bear him out. Moreover, that approach seems to accord with the philosophy of the Uniform Rules of Evidence to the effect that relevant evidence is generally admissible, Rule 7(f), subject to Rule 45, whereby the trial judge may in his discretion exclude admissible evidence to avoid undue prejudice or the confusion of collateral issues.
The avowed purpose of introduction of the proof of the previous accident in the case at hand was (a) to show the harmful tendency of the conveyor if moved by handpower; and (b) to show notice of that tendency to the defendants as material to their foresight of its hazard if so used. However, in the present case the mere occurrence of the earlier incident was not inferential of notice to all the defendants. For example, Fields was not shown to have worked at that project, and plaintiff does not claim the earlier accident was known to him. Where a prior accident is allowed to be proven, in this State, it is only to show the persistence of a condition long enough to import constructive notice thereof to the owner or occupant or where the occurrence of itself clearly warrants the inference that the allegedly responsible person knew it occurred and thus had notice of the alleged unsafe condition. Here neither of these considerations was applicable. Here there was no problem concerning the continuance of a visible, objective condition which by lapse of time would import notice; further, as indicated, the mere occurrence did not of itself reasonably bespeak actual notice to any particular one of these defendants, individually (as distinguished from imputed notice to the *320 corporate entity through the high likelihood of notice to some agents). Therefore, admission of the testimony of Polito could only have given rise to what the controlling authorities in this State, cited above, consider an impermissible function of such proof, i.e., to show a dangerous tendency, and without the saving grace of the permissible function of notice. We consequently are constrained to hold the proof of the prior accident, as such, to have been properly excluded.
We shall, however, approach the issue of the liability of Fowler on the assumption, arguendo, of proof of the conceded (but excluded) fact that he did hear of the accident. This circumstance will be seen not to produce any conclusion of error in the dismissal ordered as to him.

III.
This brings us to an examination of the rules of law applicable to the liability of corporate employees or officers to another employee for personal injuries allegedly the proximate result of the negligence of the former.
The most recent reported New Jersey restatement of the rule is that found in our opinion in Evans v. Rohrbach, 35 N.J. Super. 260, 263-264 (App. Div. 1955), certification denied sub nom. Evans v. Matthews, 19 N.J. 362 (1955):
"* * * while `a director or officer of a corporation does not incur personal liability for its torts merely by reason of his official character,' yet `a director or officer who commits the tort or who directs the tortious act to be done, or participates or cooperates therein, is liable to third persons injured thereby, even though liability may also attach to the corporation for the tort.'"
See also Sensale v. Applikon Dyeing & Printing Corp., 12 N.J. Super. 171, 175 (App. Div. 1951); Stacy v. Greenberg, 9 N.J. 390, 397 (1952), referring to the fact that the statutory coverage of workmen's compensation does not in this State obviate a right of action on the part of an *321 injured employee against a fellow-employee "whose negligence or wrong occasions his injury" (there involuntary negligence in the operation of an automobile).
The continued subsistence of a cause of action in tort against a fellow-employee has come under considerable public criticism in recent years. It has frequently resulted in burdening the employer indirectly with common-law damages superimposed upon his workmen's compensation liability by reason of either a legal, moral or practical obligation to indemnify the sued director, officer or supervisory employee, or with the expense of carrying insurance to cover the personal liability of such supervisory personnel. See statement appended to Assembly Bill No. 117 (1960); see also Hagen v. Koerner, 64 N.J. Super. 580 (App. Div. 1960). Recognizing that such consequences conflict with the general scheme of the Workmen's Compensation Act, the Legislature this year amended the act (R.S. 34:15-8) expressly to preclude a right of recovery on account of a compensable injury or death at common law or otherwise against a fellow-employee except in cases of intentional wrong. L. 1961, c. 2. This legislation does not, however, affect the pending appeal, as it operates only prospectively. We are therefore required to give the problem before us the careful attention its doctrinal complexity demands, entirely apart from the effect of the statutory amendment. Moreover, much of our analysis will continue to remain relevant in relation to actions by non-employee third persons, see Evans v. Rohrbach, supra (35 N.J. Super., at p. 266), as well as the case where the defendant is an agent of the employer not "in the same employ" as the person injured or killed. N.J.S.A. 34:15-8, as amended.
The development of the common-law tort rule of liability of agents to employees of the principal (and to other third persons) has had an historical relationship to the rule confining liability for breach of contractual obligations to those with whom the obligor stood in privity. This connection was based on the contractual aspect of the relationship between *322 master and servant and the assumption that a failure to perform a duty to the master entailed no liability other than to the master, within the privity principle. This notion is commonly attributed to Marsh and Astreys Case, 1 Leonard 146, 74 Eng. Rep. 135 (K.B. 1609), where it was argued to the King's Bench by Coke that an undersheriff could not be held answerable to a litigant for his wrongful omission to return a summons, that being nonfeasance for which only the sheriff, in whose name the summons issued, could be called to account by a third person. It was acknowledged, however, that the undersheriff would be liable to third persons for positive acts of misfeasance, though committed in his representative capacity. The case is noted in legal history for the argument thus made, not for the judgment, which was given for the plaintiff. The rule was more formally set forth in Lane v. Cotton, 12 Mod. 472, 488, 88 Eng. Rep. 1458, 1467 (K.B. 1663), in what appears to have been a dissenting opinion by Lord Holt: "* * * for a servant or deputy, quatenus such, cannot be charged for neglect, but the principal only shall be charged for it; but for a misfeasance an action will lie against a servant or deputy, but not quatenus a deputy or servant, but as a wrongdoer." Story expressly rationalized these authorities as immunizing the servant from liability to third persons for "nonfeasances" on the basis that the servant had not directly bound himself to an obligation to such persons. Story on Agency (1839), § 308, pp. 314, 315. See Annotation, 20 A.L.R. 97, 101-104 (1922).
The distinction stated has had wide acceptance in American jurisdictions. See, as representative of many cases so holding, Murray v. Usher, 117 N.Y. 542, 23 N.E. 564 (Ct. App. 1889); Wilson v. Thayer County Agricultural Soc., 115 Neb. 579, 213 N.W. 966, 52 A.L.R. 1393 (Sup. Ct. 1927); Eads v. Young Women's Christian Ass'n, 325 Mo. 577, 29 S.W.2d 701 (Sup. Ct. 1930); Coffer v. Bradshaw, 46 Ga. App. 143, 167 S.E. 119 (Ct. App. 1932); Montanick v. McMillin, 225 Iowa 442, 280 N.W. 608 (Sup. Ct. 1938); *323 Campbell v. Weathers, 153 Kan. 316, 111 P.2d 72 (Sup. Ct. 1941); Greenberg v. Post, 155 Fla. 135, 19 So.2d 714 (Sup. Ct. 1944); Caldarola v. Moore-McCormick Lines, 295 N.Y. 463, 68 N.E.2d 444 (Ct. App. 1946), affirmed sub nom. Caldarola v. Eckert, 332 U.S. 155, 67 S.Ct. 1569, 91 L.Ed. 1968 (1947); O.P. Leonard Trust v. Hare, 305 S.W.2d 833 (Tex. Civ. App. 1957); Towt v. Pope, 168 Cal. App.2d 520, 336 P.2d 276 (Ct. App. 1959). The Caldarola case, supra, illustrates the applicability of the rule in favor of agents who are not employees or servants in the ordinary sense.
It is noteworthy, however, that many of the decisions which purport to employ the nonfeasance-misfeasance distinction have held fellow-servants and agents liable to third persons by finding "misfeasance" in certain omissions. For example, the court in Franklin v. May Department Stores Co., 25 F. Supp. 735, 736 (D.C. Mo. 1939), stated:
"There can be no recovery from an agent or servant for nonfeasance alone unless the agent has assumed and actually commenced such a complete and exclusive control of management or operation as to warrant saying that he failed in discharging or completing a duty theretofore assumed and commenced."
(Compare the language of Gudnestad v. Seaboard Coal Dock Co., 15 N.J. 210, 224-225 (1954).) The Franklin opinion continued:
"When the latter situation exists the entire obligation and duty to manage or control is viewed in its entirety as a single act to be performed and the assumption of the obligation is considered as the beginning of the actual performance of the single act  the entire obligation. And the failure to perform an individual specific act forming part of the entire duty is taken out of the category of nonfeasance as surely as is the negligent failure to guard or cover a partially completed excavation at night when persons might fall into it and be injured. * * *" Ibid.
To the same effect are Ryan v. Standard Oil Co. of Indiana, 144 S.W.2d 170, 172 (Mo. App. 1940); Hoppendietzel *324 v. Wade, 66 Ga. App. 132, 17 S.E.2d 239, 241 (Ct. App. 1941); and Landreth v. Phillips Petroleum Co., 74 F. Supp. 801, 802 (D.C.W.D. Mo. 1947). (Compare the rule thus stated with that of our courts in defining the scope of municipal immunity from tort liability for nonfeasance. Hartman v. City of Brigantine, 42 N.J. Super. 247, 259 (App. Div. 1956), affirmed 23 N.J. 530, 533 (1957); Hayden v. Curley, 34 N.J. 420 (1961).)
It has also been held that a specific direction by an intermediate superior employee may constitute an act of misfeasance, Whittle v. Atlas Powder Co., 34 F. Supp. 563 (D.C.E.D. Tenn. 1940); that a railroad agent's failure to ice fruit cars, though nonfeasance as to his principal, is misfeasance as to a third person damaged thereby, E.N. Emery & Co. v. American Refrigerator Transit Co., 194 Iowa 926, 189 N.W. 824 (Sup. Ct. 1922); that a foreman who chose the time, place and manner of replacing a pole carrying power lines, assisted in the work and failed to secure the equipment necessary to de-energize the lines or to warn a fellow-servant who was electrocuted, was guilty of misfeasance, Dudley v. Community Public Service Co., 108 F.2d 119 (5 Cir. 1940); and that a factory manager who assumed to direct an employee in the manner of operating a machine, owed her the duty of directing her properly, a breach of which would constitute misfeasance, Hoeverman v. Feldman, 220 Wis. 557, 265 N.W. 580 (Sup. Ct. 1936).
Other courts have either expressly refused to recognize, or have simply not acknowledged the legitimacy of the misfeasance-nonfeasance distinction. Representative of such holdings are Ellis v. Southern Ry. Co., 72 S.C. 465, 52 S.E. 228, 2 L.R.A., N.S., 378 (Sup. Ct. 1905); Murray v. Cowherd, 148 Ky. 591, 147 S.W. 6, 40 L.R.A., N.S., 617 (Ct. App. 1912); McCourtie v. Bayton, 159 Wash. 418, 294 P. 238 (Sup. Ct. 1930); Carter v. Franklin, 234 Ala. 116, 173 So. 861 (Sup. Ct. 1937); Brooks v. Jacobs, 139 Me. 371, 31 A.2d 414 (Sup. Jud. Ct. 1943); State for Use of Lay v. Clymer, 27 Tenn. App. 518, 182 S.W.2d *325 425 (Ct. App. 1943); Bryant v. Schrage, 75 Ohio App. 62, 60 N.E.2d 801 (Ct. App. 1945); Lawrence Warehouse Co. v. Defense Supplies Corp., 164 F.2d 773 (9 Cir. 1947), amended 168 F.2d 199 (9 Cir. 1948), reversed as amended 336 U.S. 631, 69 S.Ct. 762, 93 L.Ed. 931 (1949); Employers' Fire Ins. Co. v. United Parcel Service, 89 Ohio App. 477, 99 N.E.2d 794 (Ct. App. 1950); United States v. Hull, 195 F.2d 64 (1 Cir. 1952).
We find no reported New Jersey case to have exonerated an agent or servant from liability by express reason of the passive nature of his wrongdoing, although a number of judicial declarations suggest that such a rule would have been applied to a proper case. The earliest discussion in our case law appears in Chancellor Magie's opinion in O'Brien v. Traynor, 69 N.J.L. 239 (E. & A. 1903). Defendant foreman in that case and the injured workman were both engaged in moving a barrel when, due to the careless manner in which the defendant handled the barrel, plaintiff was injured. The court commented upon an early Massachusetts case which had held a fellow-employee not liable to the plaintiff on the ground his negligence breached only a duty owed the common employer, saying that approach did not apply in the case before it, for the reason that "where the dereliction of the defendant is not mere nonfeasance in failing to perform some act which he stipulated with his master to perform, but is actual misfeasance in doing an act which is tortious," an action will lie (69 N.J.L., at p. 241). And further, "in the case in hand the injury suffered by plaintiff was not the result of defendant's nonfeasance or neglect of any duty which defendant owed to the common master, but was a plain misfeasance and a breach of a duty which defendant owed to plaintiff only." Id., 69 N.J.L., at p. 243.
The O'Brien case cited Osborne v. Morgan, 130 Mass. 102, 39 Am. Rep. 437 (Sup. Jud. Ct. 1881), which held that where the fellow-servant placed a block and chain upon a rail and negligently permitted them to remain unprotected *326 from falling, the apparatus later falling upon the plaintiff, there could be recovery. Upon appeal from a directed verdict for defendant, the court, in reversing, held that although defendants could not be held by plaintiff for any negligence which was only a breach of the contract with or duty to the employer, yet if defendant was found to have had control over the appliance which did the injury to the plaintiff and knowledge of its dangerous condition, he would be charged with a duty to plaintiff to care for his safety. (39 Am. Rep., at pp. 438-439.) The acts complained of both in Churchill v. Stephens (91 N.J.L. 195, at p. 196 (E. & A. 1917)), and Duffy v. Bates, 91 N.J.L. 243, 245-246 (E. & A. 1918), were held to constitute active wrongdoing. The decisions in Sensale v. Applikon Dyeing & Printing Corp., supra, 12 N.J. Super. 171, and Evans v. Rohrbach, supra, 35 N.J. Super. 260, cite O'Brien v. Traynor, supra, as authoritative, but without reference to the "nonfeasance" dictum. In both of those cases the defendant corporate officers were held to have been too remote in point of responsibility from the allegedly negligent operation for liability; and in the respective fact-posture of each the defendant-officer had lawfully delegated responsibility for conducting the job on which plaintiff was injured. But it is observable that in both the Sensale and Evans cases, supra, attempts were made to fasten liability on fellow employees on the basis of negligent failure to act, and in neither did the court resort to disposition of the cases on the basis of nonfeasance.
There is thus no square holding by a New Jersey appellate tribunal applying a fellow-servant's or agent's defense of nonfeasance as such, and we conceive ourselves to be free to accept or to reject the distinction as it may or may not accord with sound principles of justice and the modern approach to tort liability.
The distinction will not bear critical analysis, particularly in view of the relationship of the servant's immunity to outmoded notions of privity. See infra. The privity doctrine *327 would deny the existence of any duty by an agent or servant in respect of the performance of the contract to anyone but the principal or master. Hence an inquiry into the reasonableness or sense of the misfeasance-nonfeasance distinction can properly be undertaken only where a duty to the tort suitor is first established on a basis independent of the relationship between master and servant. The nonfeasance aspect of the distinction obviously bears not upon considerations relevant to postulation of a tort duty, but upon the nature of the breach of any duty postulated. However, many employment functions, e.g., those of a safety inspector, are of such nature that they are usually incapable of misperformance otherwise than by nonperformance. At the same time such nonperformance may quite foreseeably subject other employees to the risk of harm resulting therefrom, thereby implicating a tort duty to avoid such nonperformance, under well settled modern doctrine. It would make little sense to hold that want of privity is irrelevant to the implication in law of a duty of due care from the employee to a fellow-employee, only to hold further that nonperformance of an employment function will not constitute a breach of such a duty for the mere reason that it incidentally happens also to be a breach of the employment contract.
Similarly, it is elementary that a duty to act carefully with respect to those within the zone of hazard arises, in any event, upon an undertaking to act at all, whether gratuitously or pursuant to a contractual obligation. See Restatement of Torts, § 325. Hence a positive act of misfeasance, as in O'Brien v. Traynor, supra, will give rise to liability in tort notwithstanding any lack of contract privity between the co-employees.
The nonfeasance distinction thus resolves itself into little more than a totally illogical remnant of the privity doctrine.
In the various areas of mixed tort-contract liability, our courts have recently been increasingly curtailing the influence of the leading modern decision for strict application *328 of the privity rule, Winterbottom v. Wright, 10 M. & W. 109, 152 Eng. Rep. 40 (Exch. 1842). While closely followed in such earlier New Jersey decisions as Cuff's Administrators v. Newark and New York Railroad, 35 N.J.L. 574 (E. & A. 1871), affirming o.b. 35 N.J.L. 17 (Sup. Ct. 1870); Marvin Safe Co. v. Ward, 46 N.J.L. 19, 24 (Sup. Ct. 1884); and Styles v. F.R. Long Co., 67 N.J.L. 413 (Sup. Ct. 1902), reaffirmed in a later phase of the same case, Styles v. F.R. Long Co., 70 N.J.L. 301 (E. & A. 1904) (all involving liability of independent contractors to third persons for negligence in performance of contract), the more recent tendency is to disregard the contract and impose liability where performance or default thereof by reasonable foreseeability creates a risk of harm extending to the situation of the plaintiff. See O'Donnell v. Asplundh Tree Expert Co., supra (13 N.J. 319); Henningsen v. Bloomfield Motors, Inc., supra (32 N.J. 358); Faber v. Creswick, 31 N.J. 234 (1959); and Pabon v. Hackensack Auto Sales, Inc., 63 N.J. Super. 476 (App. Div. 1960). There seems no sound reason why the privity rule should not be disregarded, where irrelevant in the light of modern tort concepts, as fully in cases where the defendant has contracted with a third person for labor or services as where the contract is for the sale of chattels. See Prosser on Torts (2d ed. 1955), § 85, p. 514. See also comment on Caveat to Restatement, Agency 2d, § 354, p. 129 (1958).
See also the doctrinal attacks upon the misfeasance-non-feasance distinction in Darling & Co. v. Fry, 24 S.W.2d 722, 723-724 (Mo. App. 1930); Colton v. Foulkes, 259 Wis. 142, 47 N.W.2d 901, 903-904 (Sup. Ct. 1951); Adams v. Fidelity & Casualty Co. of New York, 107 So.2d 496 (La. Ct. App. 1958); 3 Fletcher, Corporations (1947), § 1161, pp. 771-774; Mechem on Agency (1952), § 348, p. 235; and Annotation, 20 A.L.R. 97 (op. cit., supra, pp. 99-107). The cited annotation also illustrates how it has come about that many courts, unhappy with the distinction, have evaded it by straining to find misfeasance in situations basically of *329 inaction, rather than by attacking the distinction frontally, on its conceptual indefensibility.
In its recent revision of the Restatement of Agency the American Law Institute has made a careful effort to restate the conflicting principles of servants' and other agents' liability to third persons. Section 350 of the Restatement, Agency 2d (1958), states the general rule of misfeasance that "an agent is subject to liability if, by his acts, he creates an unreasonable risk of harm to the interests of others protected against negligent invasion." Section 351 would subject him to liability if he "directs or permits" another to act in such a manner as to create an unreasonable risk of harm to a third person, provided the agent charged should, under the circumstances, realize that his direction or permission would create such a risk. Section 352 modifies the rule of nonfeasance to the extent of conditioning absolution of the agent of liability to third persons injured by his failure adequately to perform his duties to his principal, by the absence of reliance upon such performance by others. Also, liability obtains for such harm if the agent has assumed control of the land or instrumentality causing the harm. Section 354 seeks to cover negligent omissions to perform duties owed the principal, where the agent should realize that his continued action is necessary for the protection of others, either the principal or the other has relied upon the undertaking, and the failure creates an unreasonable risk of harm. The "caveat" to Section 354 recognizes that "it is not clear that liability will result from the agent's subsequent failure of performance" if the agent has not yet entered upon performance. Section 356 provides that an agent who has taken control over the conduct of another, who, if not controlled, is likely to cause harm to others, is under a duty to use reasonable care to exercise such control as is within his authority. Under Section 358 an agent is not liable for the conduct of other agents unless he is at fault in appointing, supervising or cooperating with them. Section 359 provides that the liability of a servant or agent to a *330 fellow-servant or other agent employed by the employer is the same as to third persons.
The "reliance" requirement of sections 352 and 354 finds little express support in the cases but was included in an effort to harmonize conceptually the rules governing agents' liability to third persons with section 90 of the Restatement of Contracts (promissory estoppel) and sections 314-320 of the Restatement of Torts (gratuitous undertakings). See Reporter's Notes to Restatement, Agency 2d, Appendix, pp. 583, 592. Suggested also is the notion that, absent reliance upon the agent's undertaking, the agent's failure to carry through his obligation cannot be considered the legal cause of the injury. Ibid. Of course, reliance need not be shown expressly; it may be implied. For example, as indicated in comment (a) to section 354, by undertaking a job a person prevents others from undertaking it. If the work given the agent is for the protection of others and the agent defaults, the others do not receive the protection they would otherwise have received. This sufficiently spells out reliance.
The whole cast and philosophy of the Restatement provisions outlined make manifest that they have largely modified the effect of the distinction between nonfeasance and misfeasance of the agent's duties, as such. As stated in the reference to that distinction in the Reporter's Notes to Sections 350-357, supra (Appendix, at p. 581):
"With the modern rationalization of torts, the older distinctions are rapidly disappearing. Courts are coming to recognize that tort liability is based upon the defendant's interference with the affairs of others in such a way that he ought to realize that he is likely to harm the others, or upon the defendant's control of something which, unless controlled, is likely to be dangerous to another. No longer is it of importance whether the event which caused the harm was an act or a failure to act. If, in the whole course of a person's conduct, it is found that he has interfered with the affairs of others or has assumed control of a situation, he becomes subject to a duty to act to prevent harm which the situation has created. * * *"
Upon consideration of the foregoing authorities and of their several underlying rationales, and in the absence of *331 clear, controlling contrary authority in this State, we are of the view that the Restatement principles reflect New Jersey law, and we will be guided by them, as well as by our cases, insofar as they are applicable to the issues on this appeal.
An application of the foregoing conclusions to the facts at hand requires, in relation to the defendants Fowler and the two Muscarelles, additional refinement of the postulate arrived at, that inaction, as well as affirmative action, may give rise to tort liability by an agent. The mere fact that two individuals are employed by the same employer does not, of itself, impose a duty on one of them to act for the safety of the other. But if the common employer has placed a duty on the one, either expressly or by clear implication, which he has accepted, respecting matters related to the safety of other employees, and there can be said to have been reliance on the performance of that duty such that default therein has foreseeably brought the others within the risk of harm consequent upon nonperformance of the duty, liability for harm proximately so resulting will ensue. The basic factor requiring emphasis is that the neglect or inaction must pertain to an obligation assumed by the defendant to the employer. In such circumstances the contract duty to the employer becomes transmuted into tort duty to the fellow-employee.
A clear illustration of these principles is found in Evans v. Rohrbach, supra (35 N.J. Super. 260). There a large corporation engaged in the rubber lining of metal tanks had instituted a safety program relative to operation by workmen inside such tanks. There were obvious hazards of fire in the physical operations. The safety program included the hiring of a safety engineer. The defendant Matthews was in over-all charge of the plant. A worker injured as a result of non-observance of safety regulations in effect sued Matthews, among others. The court held Matthews not liable, because it found he had discharged his own duties. He had exercised care in engaging the safety engineer, and he *332 was entitled to assume that the latter and other lower-echelon supervisory employees were carrying out their part of the safety program. It is to be emphasized that the company, not Matthews, had instituted the safety program. His duty flowed from the imposition upon him by the company of executive responsibility over all the operations, and he had discharged that duty. We did not hold Matthews had a duty himself to formulate a safety program. In accord: S.H. Kress & Co. v. Selph, 250 S.W.2d 883 (Tex. Civ. App. 1952) (compare Dillon v. Wallace, 148 Cal. App.2d 447, 306 P.2d 1044 (App. Ct. 1957), facts similar to S.H. Kress case, but duty found breached); Gennaux v. Northwestern Improvement Co., 72 Wash. 268, 130 P. 495 (Sup. Ct. 1913) (a mine superintendent held not liable where miner was injured by fall of rock: "While he had a general supervision, there was no evidence showing a duty of personal inspection of the underground workings on his part," 130 P., at p. 499); Whittle v. Atlas Powder Co., supra, 34 F. Supp. 563; Morefield v. Ozark Pipe Line Corporation, 27 F.2d 890 (D.C.N.D. Okl. 1928); Towt v. Pope, supra, 168 Cal. App.2d 520, 336 P.2d 276 (although the result is reasoned on the "nonfeasance" theory); Carter v. Franklin, supra, 234 Ala. 116, 173 So. 861; Franklin v. May Department Stores Co., supra, 25 F. Supp. 735; and see, but differentiate, Pester v. Holmes, 109 Neb. 603, 191 N.W. 709 (Sup. Ct. 1923).
Where by clear implication of fact the duty of protecting others has been placed on the supervisory employee by the common employer, generally found where the defendant directs the employee to do the specific dangerous act or is working directly with him, liability is, of course, found. Gennaux v. Northwestern Improvement Co., supra (as to a defendant foreman); Peterson v. General Geophysical Co., 185 P.2d 56 (Cal. App. 1947); Hoeverman v. Feldman, supra, 220 Wis. 557, 265 N.W. 580; Perkins Oil Co. of Delaware v. Fitgerald, 197 Ark. 14, 121 S.W.2d 877 (Sup. Ct. 1938) (the last two cases may also be taken as illustrating *333 the rule of liability where the defendant assumes personal direction of an operation, but negligently).
The Restatement of Agency sections cited above make it clear that, while the agent may be liable where he does, directs or permits the hazardous act himself, he is not liable for failure to perform an act not made by his employer a duty to the latter. Section 352 mentions "failure adequately to perform his duties to his principal * * *." Section 353 refers to "an agent entrusted by his principal with a duty to act," etc. The comment to section 359 (pp. 133, 134 of Restatement of the Law, Agency 2d, §§ 284 to end) states: "The fact that one is an agent gives him no immunity from liability for harm to other agents of the same principal; nor does it increase his liability to such other agents except where his duties include the protection of such other agent, in which case the rules stated in Sections 353-357 apply." (Emphasis added)
Central to these principles is the consideration that the law does not impose, by a species of implication of law, as distinguished from reasonable implication in fact, a duty on the supervisory or executive corporate employee to assume in invitum functions or responsibilities respecting the safety of workmen not placed upon the former by the corporation itself. (It is another matter if he voluntarily assumes or enters into such functions.) So to do would unwarrantably approach equating the personal liability of the executive or superintendent with the general comprehensive tort liability of the corporate principal, including the application of the doctrine of respondeat superior. Such an approach, moreover, would subvert the purpose and policy of the Workmen's Compensation Act which relegates the employee to a fixed, scheduled recovery against the corporation without regard to fault, and, as pointed out earlier in this opinion, would tend indirectly to lay a substantial additional burden on the employer, if not unjustly to penalize the supervisory employee.

*334 IV.
We proceed to apply the law to the facts, appraising the facts in the light most favorable to plaintiff, as the trial court was legally required to do on the motions for dismissal, in order to determine their sufficiency reasonably to raise questions for decision by the jury under the controlling legal principles.

1. AS TO JOSEPH MUSCARELLE.
This defendant was totally removed from the physical activities surrounding Miller's death. Clearly he did not "direct" the use of the conveyor in the particular manner it was being used on this occasion. He cannot be said to have "permitted" it either, in the sense of Restatement, § 351, since his place in the administrative scheme of the corporation did not go either to control of the manner of use of particular tools or implements or to field operations of any nature, all of which were delegated by the corporation to others. See Evans v. Rohrbach, supra.
Plaintiff urges that as chief executive Muscarelle should have instituted a safety program which would have operated to prevent the use of the conveyor in the allegedly unsafe manner here attempted, either by positive directions to that effect by designated safety personnel or by placing in charge of its use adequately qualified and trained personnel.
But the corporate directorate did not, from any fair appraisal of the evidence, impose any such duties on Joseph Muscarelle, either expressly or by fair implication from the facts, contrary to the situation found as to the defendant Matthews in the Evans case, supra. It is no answer to say that Muscarelle was, to all intents and purposes, the dominant director of the corporation, because this leads to the wrong of indirectly saddling the corporation with a liability to an employee incompatible with its obligation to him under the compensation act. Moreover, it would impose an individual liability upon Muscarelle which he was legally entitled *335 to avoid by organizing his business, along with his associates, as a corporate entity. In other words, a neglect as to safety precautions by the corporation, through the absence of appropriate affirmative action by its officers and directors, while subjecting it to such tort or compensation liability as the law declares, does not equate with a default of personal duty to the corporation by such agents which gives rise to individual liability to other employees.
Plaintiff argues Muscarelle had implied authority on behalf of the corporation to institute safety procedures for the corporation. Agreed. If he consequently undertook to institute such procedures, but was negligent in carrying out his undertaking, the rules discussed above might visit liability upon him. But this does not bespeak personal duty to do so, and personal liability for failure to do so. See the discussion, supra.
Apart from the foregoing, there is no evidence at all to connect this defendant with the physical operations at the wall of the Bamberger Building at the project. There were several intermediate supervisory personnel between him and the conveyor operation, and this insulates him from liability on the theory of participation. See Evans v. Rohrbach, supra (35 N.J. Super., at p. 268).

2. AS TO FOWLER.
We are assuming, as noted above, that this defendant is chargeable with knowledge of the fact of the prior accident, since the fact of such knowledge would have been established by introduction of a portion of Fowler's deposition which was excluded on objection. Technically, however, the exclusion is not chargeable as error, for reasons set forth above.
We nevertheless find no error in the dismissal as to this defendant.
As in the case of Joseph Muscarelle, the corporation imposed no duty of overseeing the safety of the use of the *336 conveyor on Fowler. The fact that he was project manager necessarily entailed no such obligation, either express or reasonably impliable on the facts. This corporation simply assumed that the conveyor could be operated without difficulty in such manner as a labor foreman might elect. The conveyor was mounted on wheels, which suggested prima facie that it could feasibly be pushed where needed. The corporation did not provide mechanical power for its movement. It seems to have depended for safety in the physical operations, generally, on an insurance company representative and the union shop steward. Perhaps the corporation was negligent, but it imposed no duty on Fowler to verify what was taken for granted. Nor did Fowler voluntarily assume such a duty. See Restatement, Agency 2d, § 354. There is no evidence to indicate that the corporation required or expected Fowler to do more than coordinate and expedite construction progress; or that he was to check on the skills of such foremen as Fields. Between Fowler and the specific operation here involved were interposed by the corporation a general superintendent, an area superintendent, and a foreman. He is not shown to have hired any of them, although he assigned each to his post of duty. But obviously the corporation allowed each autonomy over the manner of doing his work and using the equipment, except for leaving safety to shop stewards and insurance inspectors.
Although Fowler knew of the prior accident, there is nothing to indicate he was expected by the corporation to do more than he did, i.e., to report it to the insurance company. For all that appears as to what Fowler knew about that incident, assuming he had any further duty in respect thereto, he may well have assumed it to have been an isolated, freak accident, not apt to recur. In any event, we find no departure from duty to the corporation by this defendant, and no participation by him in the assumedly tortious act.
We note the argument in plaintiff's brief that Fowler was under a statutory duty under the State Safety Code to *337 see to the installation of proper "safeguards and equipment devices," R.S. 34:5-4, 161; and that violation of the said duty constitutes transgression of a legislative mandate of required conduct, giving rise to a cause of action in favor of those injured thereby.
This contention was not made in the pretrial order, in opposition to the motions to dismiss, or, so far as we can find, during the trial. It therefore cannot be raised for the first time on appeal.
In any case, the statute is not here applicable. The substantive section particularly relied upon, R.S. 34:5-4, requires that "the construction, erection, alteration and removal of scaffolds, and the application, installation and setting up of safeguards and equipment devices shall be done by skilled workmen under the supervision of a person qualified by experience or training for such work." By R.S. 34:5-161 a "manager, superintendent," etc., or "other person in charge of any building, construction or other place" in which Chapter 5 of Title 34 is violated is made penally responsible. It is clear to us, within the required strict construction of a penal statute, that neither Fowler nor the other defendants were in violation of the true intent of the act on the basis of the evidence before us here.

3. AS TO CHARLES MUSCARELLE.
Everything which has been said above as to Joseph Muscarelle and Fowler is largely applicable also to this defendant. His functions and duties were of the nature of Fowler's, but in subordinate degree. Between him and the physical operations on the project intervened the area superintendents, none of whom are sued here, and the various building trades foremen. There is no evidence that the corporation expected him to check the safety of the working implements or the superintending skills of any of the foremen. He violated no duty to the corporation, therefore owed no duty to the decedent. He did not participate in any tort to decedent. The dismissal as to him was correct.

*338 4. AS TO FIELDS.
This defendant did directly participate in the fatal activity. He had control of the specific operation. He owed to the decedent a duty of reasonable care in relation to any foreseeable hazard in the maneuver involved.
However, it must be noted that the charge of negligence against him in the complaint and pretrial order, or at trial, does not encompass carelessness in the manner of moving the conveyor, e.g., the exertion of more manpower on one side than the other, the factor which, according to Fields' testimony, caused the conveyor boom to "twist" and the conveyor itself to leave the track and collapse. Consequently any supposed fault of Fields in that regard cannot be considered on this appeal. The gravamen of the charge against Fields is the very use of this equipment at all without mechanical motive power. But we cannot agree that it would have been reasonable for any jury to impute to Fields a departure from ordinary reasonable care in having this conveyor pushed by manpower at the time and under the circumstances. He was not an engineer. He had many times moved this conveyor in the same way, under the same circumstances, and without mishap; he had never been instructed to the contrary by anyone in authority. Its general appearance as an implement on wheels apparently seemed to suggest the feasibility of its being pushed short distances by manpower. He was given no alternative means of moving it by his superiors. If the accident two years before was suggestive of a hazard, there is no evidence he knew about it. That had happened on a different construction job, and he is not shown to have even worked on it.
It is true, as plaintiff urges, and as comment (a) to section 350 of the Restatement of Agency, 2d declares (at p. 119), that if the unreasonable risk of an activity is created by the nature of the instrumentalities the agent uses, or defects in them of which he should know, the fact they are supplied by the principal does not relieve him of liability *339 for their use. But we cannot discern a jury question as to Fields' actual or imputable knowledge of the danger of this conveyor, as used by him. Moreover, there is an absence of showing of proximate cause in this regard, because there is no evidential basis for an inference in probability that if he had refused to move the conveyor by manpower the company would have supplied mechanical motive power.
The alternative suggestion now advanced, but not in the complaint or pretrial order, that Fields should have tied the conveyor to the flanged wheels on which it rode, if entertainable at all at this stage of the case, is similarly, in our judgment, not a reasonable basis upon which to predicate negligence against Fields on the record herein. If he had no reasonable basis to foresee a separation of the conveyor from the wheels, there was no purpose in tying them together.
There was a proper dismissal as to Fields upon the theory of negligence projected against him below.

V.
Plaintiff complains of the exclusion of a portion of Fields' deposition assertedly bearing upon whether he had knowledge of any problem-solving procedure of the company in the field. Our examination of the transcript of the depositions indicates, rather, that the questions to the witness had to do with his knowledge concerning the knowledge of other persons in the company as to the dangerous propensities of the conveyor. We think the questions were therefore properly excluded. Moreover, our conclusions above concerning the absence of duty of the other defendants in relation to the inquiry propounded make the question raised an academic one.

VI.
Plaintiff also argues there was error in not permitting her to offer a third expert witness, not named in answers *340 to interrogatories, after the first two such witnesses were rejected. But since we have approached the legal questions herein on the assumption of the submission of expert testimony of the kind relied upon, this issue is also academic.
Judgment affirmed; no costs.