**Terrence J. MARTIN, Administrator of the Estate of Bennie Lee Ellington, Deceased, Appellant,**

v.

**Harleston R. WOOD and William E. Boger.**

**Terrence J. MARTIN, Administrator of the Estate of James David, Deceased, Appellant,**

v.

**Harleston R. WOOD and William E. Boger.**

Nos. 16726, 16727.

United States Court of Appeals Third Circuit.

Argued May 23, 1968.

Decided Aug. 12, 1968.

Avram G. Adler, Freedman, Borowsky & Lorry, Philadelphia, Pa., for appellant.

Perry S. Bechtle, Liebert, Harvey, Bechtle, Herting & Short, Philadelphia, Pa. (James P. Gannon, Philadelphia, Pa., on the brief), for appellee.

Before HASTIE, Chief Judge, and KALODNER and STALEY, Circuit Judges.

## OPINION OF THE COURT

STALEY, Circuit Judge.

These are appeals by Terrence J. Martin, administrator of the estates of two deceased employees of the Alan Wood Steel Company, from judgments of the district court, entered at the close of plaintiff's case, directing verdicts against plaintiff-appellant and in favor of defendants-appellees, Harleston R. Wood and William E. Boger. Plaintiff's theory in the district court was that Wood, as president of the corporation, and Boger, as vice president in charge of operations, conducted themselves in such a manner as to permit a defective blast furnace to emit deadly carbon monoxide gas, the effect of which caused the deaths of James David on October 18, 1961, and Bennie Lee Ellington on December 4, 1961.[1]

James David, the first man to die, was at the time of his death a stove tender at the No. 3 blast furnace of the Alan Wood Steel Company. Following the fatality, an inspector for the State Department of Labor and Industry visited the area. He testified that the doors on the stoves of the No. 3 blast furnace were rusty, and as a result of this condition water and gas leaked out of the furnace. He stated that he personally called this dangerous condition to the attention of the plant's safety engineer, Mr. Jones, who accompanied the inspector to the site of the accident. This same inspector was again called to the same scene following the death of Bennie Lee Ellington who, like David, was killed by carbon monoxide poisoning while tending the stove at the No. 3 blast furnace. The inspector testified that on this second visit he found the condition of the rusty doors still present and uncorrected.

At the time of the events precipitating these suits, the Alan Wood Steel Company had between 3,800 and 4,000 employees. Heading the organizational chain of command was appellee Wood, who as president was charged with the usual executive responsibilities of that position. He testified that before he became president in 1955, there was no companywide system of periodic or systematic inspections and that he did not institute any after he became president. The policy of the company was to place the responsibility for the condition of a department's equipment on that department's superintendent, with the superintendent devising his own system of inspection. It was Wood's testimony that as president of the company he did not include within his official duties the responsibility for seeing that safety procedures were followed; nor did he consider himself personally responsible for the safety of the company's employees. It was his policy, and the company's, to leave the determination of safety procedures to the safety department, a subdi-

1. Actions like the instant ones can no longer be brought in Pennsylvania. In 1963, the Workmen's Compensation Act was amended to exempt a fellow employee from liability, except for intentional wrongs, when the disability or death is compensable under the Act. Act of Aug. 24, 1963, P.L. 1175, No. 496, § 1, 77 Purdon's Pa.Stat.Ann. § 72. This exemption is made inapplicable to the instant suits, however, by § 2 of the Act, which provides:

"This act shall take effect immediately, but shall not apply in the case of disability or death for which a right to compensation under this act accrued on or before the effective date of this act." Act of Aug. 24, 1963, P.L. 1175, No. 496, § 2.

vision of the personnel department. In actual practice, the safety department worked in conjunction with the superintendent of the particular department of the company which was involved so that safety matters relating to the blast furnace area would be carried out directly between the safety department and the blast furnace superintendent.

Wood knew that the safety department investigated every accident, whether fatal or not, and that it made recommendations for preventing a recurrence. At the regularly held staff meeting on the Monday after David's death, Wood was informed that the safety department was conducting an investigation into the circumstances surrounding the fatality, and at a subsequent staff meeting held a week or two later, he was told that it was the consensus of everyone that David's death had been a fluke, due probably to unusually calm weather conditions, and that no one could find any way that the blast furnace was being operated differently from the way it had been run for many past years. Wood did not visit the blast furnace area after learning the outcome of the investigation, nor did he make any further inquiry. He stated that he was not told that a state investigator had discovered and reported that there was defective equipment on the No. 3 blast furnace, and if such a report was given to the company, there was no established procedure or policy by which it would be brought to his attention.[2]

Appellee Boger did not testify at the trial. Information elicited from Wood disclosed that Boger, as vice president in charge of operations, was a member of the executive staff and that he usually attended the company's staff meetings, but it was not recalled whether Boger attended the meeting at which David's death was discussed. Wood did not require Boger to visit the blast furnace area following David's death, nor did he ask him to inquire as to what safety procedures were recommended by the safety department. The evidence does not suggest that Boger did so independently.

In the chain of command below Boger's level there were two general superintendents; under each general superintendent were four superintendents, one of whom was the superintendent of the blast furnace department, the department in which decedents were employed. Under the superintendent of the blast furnace department came: the assistant superintendent, the blast furnace general foreman, and the shift foreman for the particular shift. The latter was directly responsible for operating the blast furnace and had charge of the rank and file workers in the department. The safety department was not under Boger's supervision. Boger was not generally apprised of the suggestions of the safety department; he would learn of them only if a department superintendent under his supervision refused to follow recommended safety procedures. Wood stated that, as far as he knew, at the time of the fatalities the safety department and the blast furnace department were in complete agreement as to what should be done, and neither he nor, to the best of his knowledge, Boger were asked by anyone to overrule any decision at any time regarding the operation or safety of the blast furnace.

Since jurisdiction in this case is based on diversity of citizenship, the law of Pennsylvania will apply. Plaintiff, however, has not cited one Pennsylvania decision in support of his position;[3] instead, reliance is placed upon decisions of other jurisdictions dealing largely with the distinction, whether real or meaningless, between acts characterized

2. The state inspector's report was not admitted into evidence in the district court.

3. Plaintiff did cite one case emanating from the District Court for the Western District of Pennsylvania. United States ex rel. Marcus v. Hess, 41 F.Supp. 197 (W.D.Pa., 1941), aff'd, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), rev'g 127 F.2d 233 (C.A.3, 1942). But that case does not involve the law of Pennsylvania; it concerns an informer's action brought under federal law.

as misfeasance and omissions labeled nonfeasance. We think it would be most unwise for us to join this discussion, for to do so would require us to becloud the very issue that we must decide, namely, whether under the facts of this case the appellees had a duty to act for the safety of appellant's decedents.[4]

In Pennsylvania, when the master-servant relationship does not exist between a corporate officer and an employee, the officer, merely by virtue of his executive status, is under no duty to provide the employee with a safe place to work. Bullock v. Gaffigan, 100 Pa. 276 (1882). The criteria for determining the existence of a master-servant relationship was set out by the Pennsylvania Supreme Court in Commonwealth to the use of Orris v. Roberts, 392 Pa. 572, 141 A.2d 393, 71 A.L.R.2d 1124 (1958).[5] That case involved an action by a judgment creditor against the Prothonotary of Allegheny County for the negligent indexing of a judgment by the deputy prothonotary. Plaintiff contended that since the Prothonotary had control of his subordinates, he would necessarily be liable under the theory of respondeat superior for their negligent acts and omissions. The court held that control of a subordinate was only one aspect of a master-servant relationship; there must also be a finding that the subordinate was performing services in aid of the superior's private business affairs. No such finding was made in the *Roberts* case, nor is one permissible in the instant case. The facts overwhelmingly support the conclusion that David and Ellington were working solely for the furtherance of the interests of the Alan Wood Steel Company. Any liability of the appellees, therefore, must be bottomed upon a finding of tortious conduct in their capacities as executive officers of the corporation.

The rule in Pennsylvania respecting liability of corporate officers for injuries suffered by third persons was enunciated in Chester-Cambridge Bank and Trust Co. v. Rhodes, 346 Pa. 427, 31 A. 2d 128 (1943), wherein suit was brought against Samuel Rhodes and the estate of his father, Frank Rhodes, for a breach of a duty of trust owed by the corporation while Frank Rhodes was its president and Samuel Rhodes its vice president. The court held that the defendants were not personally liable for the corporation's misconduct because they had no knowledge of the breach and did not participate therein. The court exonerated the president, Frank Rhodes, from liability in the following manner:

"The fact that Frank Rhodes was president of the corporation, and, as such, charged with general supervision of its affairs, does not serve to make him liable for the misconduct of other officers merely by virtue of his office. * * * 'The president of the corporation is an agent of very extensive, but not unlimited, powers. He is not personally liable because of his official capacity, any more than are the directors or stockholders, for torts committed by the corporation, in the absence of personal participation in the tortious act. As an agent, he is not liable for the acts of misfeasance or nonfeasance of his subordinate agents or employees.' * * *" 346 Pa. at 432, 31 A.2d 131.

---

4. Appellant also seems to contend that the district court denied him a right to jury trial in contravention of the Seventh Amendment by applying the state, rather than the federal, standard governing the sufficiency of evidence required to present a prima facie case. The argument has no place in this appeal because we are not here dealing with a factual dispute as in Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946), and Planters Mfg. Co. v. Protection Mu-

tual Ins. Co., 380 F.2d 869 (C.A.5), cert. denied, 389 U.S. 930, 88 S.Ct. 293, 19 L.Ed.2d 282 (1967), but with a question of law as to whether, under the facts as presented, appellees owed decedents a duty to either personally provide them with a safe place to work or take certain precautionary measures for their safety.

5. See also Yorston v. Pennell, 397 Pa. 28, 153 A.2d 255, 85 A.L.R.2d 872 (1959).

In Cohen v. Maus, 297 Pa. 454, 147 A. 103 (1929), plaintiff brought suit against the directors and general manager of a corporation, alleging that the defendants sold plaintiffs' merchandise and converted the proceeds to the use of the corporation. The evidence indicated that of the directors only the general manager knew of the conversion, but that they could have discovered it if they had examined the books of the company. Here again, the directors, other than the general manager, were exonerated from any wrongdoing, the court holding that it would not approve the establishment of a doctrine holding directors "individually liable for a conversion of property about which they knew nothing, merely because, if they had examined the books of the corporation, they might have ascertained that the conversion had taken place." 297 Pa. at 457, 147 A. at 104. Thus, the court refused to impose a duty upon the other directors to inspect the books of the corporation to determine whether or not there had been any tortious conduct.

Of course, both the *Rhodes* and *Cohen* decisions concern the liability of executive officers to third persons, but the principles announced therein are equally applicable to situations involving fellow employees.[6] One decision which we find particularly helpful, and which does deal directly with the liability of corporate superiors for the safety of their subordinates, is the New Jersey case of Miller v. Muscarelle, 67 N.J.Super. 305, 170 A. 2d 437 (1961). There in an extensive opinion, the court, after collating and analyzing the many authorities dealing with the very question *sub judice*, distilled and postulated the following rules:

"* * * The mere fact that two individuals are employed by the same employer does not, of itself, impose a duty on one of them to act for the safety of the other. But if the common employer has placed a duty on the one, either expressly or by clear implication, which he has accepted, respecting matters related to the safety of other employees, and there can be said to have been reliance on the performance of that duty such that default therein has foreseeably brought the others within the risk of harm consequent upon nonperformance of the duty, liability for harm proximately so resulting will ensue. *The basic factor requiring emphasis is that the neglect or inaction must pertain to an obligation assumed by the defendant to the employer.* In such circumstances the contract duty to the employer becomes transmuted into tort duty to the fellow-employee." (Emphasis added.) 67 N.J.Super. at 331, 170 A.2d at 451.

Applying these principles to the facts of the instant case, it becomes apparent that neither Wood nor Boger are legally answerable for the deaths of plaintiff's decedents. Neither of the appellees were actually present at the time of the accidents nor had they been in any way physically connected with the operations in the blast furnace area. The duty to control the manner of the use of the furnace was imposed by the corporation upon others. Neither Wood nor Boger were personally charged with nor responsible for safety procedures. The possibility that appellees may have had the authority to promulgate their own safety measures does not imply that they had a duty to do so; the corporation placed this obligation upon its safety department, which department dealt directly with department superintendents, not with appellees.

Regarding appellees' alleged liability for the second fatality, there is nothing in the record to indicate that the company imposed any additional duties upon appellees, or that they independently assumed them, after learning of David's death. The obligation to investigate and

---

6. See Restatement (Second), Agency, § 359 (1958). ("The liability of a servant and other agent to a fellow servant or other agent employed by the employer is the same as to third persons.") See generally, 20 A.L.R. 97 (1922), 99 A.L.R. 405, 422 (1935).

account for the etiology of the first accident was imposed upon and accepted by the company's safety department. Appellees were entitled to believe that this task would be properly performed. They were not informed otherwise. And although it may appear that members of the safety department or the blast furnace department, or both, were perhaps negligent in their inspection of equipment or in their implementation of appropriate safety procedures, appellees, under the law of Pennsylvania, are not liable in damages to plaintiff since there is no evidence that they participated in any tortious conduct or that they had a duty to act for the safety of decedents.

Accordingly, the judgments of the district court will be affirmed.